We will hear argument first this morning in Case 24-297, Mahmoud v. Taylor. Mr. Baxter? Mr. Chief Justice, and may it please the Court, parents everywhere care about how their young children are taught sexuality and gender identity. That's why nearly every public school in the country that provides sexuality education requires parental consent first. But Montgomery County is an extreme outlier, insisting that every elementary school student must be instructed that, among other controversial matters, doctors guessed at their sex when they were born, and that anyone who disagrees is hurtful and unfair. Forcing petitioners to submit their children to such instruction violates their religious beliefs and directly interferes with their ability to direct the religious upbringing of their children. The Board claims this straightforward burden analysis will invite chaos, but schools nationwide have long applied expansive opt-out policies without significant difficulty, including the Board itself, which still allows opt-outs for choir students who object to singing religious songs or students who object to certain storybooks, such as one that portrays an image of the Prophet Muhammad. Exempting students for some religious reasons, but not others, cannot be squared with the First Amendment. Nowhere else to go, the Board pleads for remand on strict scrutiny, but petitioners have been seeking preliminary relief for two years already at significant personal expense. One family moved in with grandparents to afford private school. Another is homeschooling at the loss of $25,000 a year in special services the school provided their daughter with Down syndrome. Most have no alternatives. Petitioners deserve complete preliminary relief. In a system where thousands of students are daily opted in and out of the class for multiple reasons, there's no basis for denying opt-outs for religious reasons. The Board does not dispute that under its theory it could compel instruction using pornography and parents would have no rights. The First Amendment demands more. Parents, not school boards, should have the final say on such religious matters. I welcome the Court's questions. Could you spend a minute or two to explain why the record shows that the children are more than merely exposed to these sorts of things in the storybooks? Yes, Your Honor. I would start with the books themselves. The books themselves teach, for example, that children... I mean, what I'm talking about is not necessarily what the books say, but rather is that, are the books just there and no more, or are they actually being taught out of the books? No, we know that the teachers are required to use the books. When the books were first introduced in August of 2022, the Board suggested they'd be used five times before the end of the year. That's in the... that's at 273A in the cert appendix. One of the schools, the Sherwood School in June for Pride Month, said that they were going to read one book each day to celebrate Pride Month. The Board's own testimony through Superintendent Hazel said that the books must be used as part of the instruction and that at 656... 642 in the appendix, that discussion will ensue. That was the entire point of withdrawing the opt-outs and removing... even notifying parents. They're not even allowed to know. The Board said in that statement it was so that every student would be taught from the inclusivity storybooks. And also the district court transcript at 63 has counsel's admission that there have... some of the books have to be used and it can be more. The school board alleges that the opt-out system became unworkable. Is that a factor we should take into account in deciding whether it could be required? Certainly, there could be situations where it could be unworkable. The Board never raised that until after this litigation commenced. When they announced the withdrawal, they said it was because every student needed to read the inclusivity books. When they produced documents in response to an open records request, there was no mention of it not being workable. When parents met with the superintendent, this is at the... in the Hisham Garti Declaration at JA44, the reason given there was inclusivity. There was no mention of administratability until we get to... until litigation's been filed. And even then, all the Board was able to come up with was the argument that in one instance, in one school, there were dozens of students who opted out. Where if the average school size in Montgomery County is 700 students across at least a dozen classrooms, you're talking maybe one student per classroom. That hardly compares with the one in eight students who are opted out for individual education programs. Students... 15% of students in Montgomery County who are taking English for speakers of a second language. The Board's own opt-outs are required from the same instruction required by state law to be opted out when the... when the same books are read in health class. Counsel, that wasn't the basis of the circuit... of the district court or the circuit court's denial of preliminary injunction. They never reached the issue of whether or not there was disruption or what the motive was for taking away the opt-out. What they decided was that there wasn't coercion here, that there was mere exposure. I understood from the record that all that was required is that the books be put on the bookshelf. If that's all that's required, is that coercion? Well, that's not what's required here. We know that's not what's required. What's required is exposure. You know, our clients are not contesting that that would be... are not saying that would be a burden. All right, then let's go to the second step. Let's see... let's say there's compulsion to read the book out loud. Is merely being exposed to the reading of book... of the book out loud coercion? Well, even the Board admits that some... that exposure could be a burden. And, for example, they say at 25 note 7 of their brief that if they were exposed to pictures of Muhammad that that would be a burden that they would allow an opt-out for. And certainly whether there's a burden... Let's go back. Is it generally that the mere exposure... haven't we made very clear that the mere exposure to things that you object to is not coercion? It would really depend on the individual religious beliefs. Here, for example, our Catholic clients... So what you're saying is that the exposure of children to the fact that two people are getting married is coercion? The two people of the same sex are getting married is coercion? So our clients have not raised that objection. I suppose someone could raise that. Let's talk about what in the portrayals so that the mere reading or looking at the pictures, like looking at an image of Muhammad, would be coercion. Because I'm looking at the books. I've looked through all of them. They have two men, Little Bobby's Wedding, where they're getting married. One is black and one is white in this rendition of the book. I had one with mice. The two male mice looked identical to me. Is looking at two men getting married, is that the religious objection? Again, it would depend on the individual beliefs of the clients. For example, many parents would object to their child being exposed to something like pornography or extreme violence. We're not going there. So Mr. Baxter, I'm sorry, let me just finish. So just answer my question. Is looking at the pictures, is there any affidavit from any parent that merely looking at people getting married, holding hands, none of them are even kissing in any of these books. The most they're doing is holding hands. That mere exposure to that is coercion. Our parents would object to that. All right. Now, so let's move to what I think your objection is. I think your objection is to the student guidance, correct? Our objections would be even to reading books that violate our client's religious belief. Their faith teaches, for example, they shouldn't be exposed to information about sex during their years of innocence without being accompanied by moral principles. And here we have both books that violate their moral principles and instruction that tells them that, for example, they can pick their pronouns based on the way they feel, not even just based on their gender, but how they feel from moment to moment. Before we move away from the book that Justice Sotomayor was referring to, Uncle Bobby's Wedding, I've read that book as well as a lot of these other books. Do you think it's fair to say that all that is done in Uncle Bobby's Wedding is to expose children to the fact that there are men who marry other men? No, Your Honor. And this court in Obergefell promised that parents would be able to continue to teach what this court called decent and honorable beliefs, that same-sex marriage is immoral according to their beliefs. And it's a far stretch from that for schools to compel students to attend. Parents are paying taxes that they have to pay at threat of criminal fines or penalties or the expense of private school. And then to have teachers telling them things that are directly contrary to their beliefs. Yeah, the book has a clear message. And a lot of people think it's a good message, and maybe it is a good message. But it's a message that a lot of people who hold on to traditional religious beliefs don't agree with. I don't think anybody can read that and say, well, this is just telling children that there are occasions when men marry other men. Uncle Bobby gets married to his boyfriend, Jamie, and everybody's happy and everything is, you know, it portrays this. Everyone accepts this, except for the little girl, Chloe, who has reservations about it. But her mother corrects her. No, you shouldn't have any reservations about this. As I said, it has a clear moral message. I could not finish, but it has a clear moral message. And it may be a good message. It's just a message that a lot of religious people disagree with. And when you add to that, Your Honor, instruction that if a student disagrees, teachers are supposed to say things like, well, I have friends in that situation. Do you think it's really fair for you to agree or to suggest that it's hurtful for students who disagree? Mr. Baxter, I guess I'm interested in what the nature of the rule you're asking for is. I mean, you started, it was about matters pertaining to sex. But as you've answered some of these questions, you've basically said, well, my clients have religious principles that conflict with what is being taught. And does it go that far? In other words, does it matter what the subject matter is? Does it matter what the age of the child is? Does it matter what the nature of the instruction is? If so, how does it matter? Or in the end, is what you're saying, when a religious person confronts anything in a classroom that conflicts with her religious beliefs or her parents, that the parents can then demand an opt out? It's really the latter, Your Honor. And that's exactly what Montgomery County allowed in its own religious diversity guidelines. Anything that violated a student's or imposed a substantial burden in their language on a student's religious or parents' religious beliefs, they had the right to opt out. But this is a rule that applies as well to a 16-year-old in biology class saying, you know, the parents say, I don't want my child to be there for the classes on evolution or on other biological matters which conflict with my religion. It would apply just as well to that. We know that those don't happen very often because country... But it would if there were. Certainly. And schools have, there are laws, for example, in states that allow students to opt out of dissection because they don't want to participate in that. And there are schools that allow, there are schools across the country, Hawaii, which has a school district about the same size as Montgomery County. And if that's, so that's a pretty broad rule. If that's the, let me ask what the next step of that is. Suppose there are things that, you know, students opt out of. And then, you know, the parents think it's just not really fair that my student, that my kid has to leave the classroom or has to put on, you know, headphones or, you know, has to otherwise be made to feel isolated. So the next challenge is really the class can't do this either. What would your position be on that? Well, no student, Your Honor, has the right to tell the school what to teach or to tell other students what they have to learn. You would clearly run into problems in that situation. But to the extent that this is a rule about people being able to access public education in a sort of equal manner, the parent might say, my child is not being able to access education in that equal manner because, you know, he's made to leave the classroom or he's made to, you know, do something else that isolates him from the class. I mean, certainly that's an argument that we've often heard with respect to prayer and that people have accepted with respect to prayer, accepted with respect to prayer, that it's kind of like not a sufficient answer to just say, don't worry, the prayer can go on. You don't have to be part of it. So I'm just wondering whether that's the next step here. No, Your Honor, I don't think so because, of course, under the establishment clause, there are different rules. But under the free exercise clause, we think that on strict scrutiny, those parents would always lose if they're trying to direct the school what to teach or tell other students what they must teach. Okay, but you are suggesting, okay, so that's a straightforward answer. I appreciate that. But just to go back, and this was also a straightforward answer, which I appreciate. But in terms of opt out, you're basically saying opt out for anything. It's really the parents that get to decide, you know, assuming that their beliefs are sincere, right? It's really the parent that gets to decide. It doesn't matter the kid's age, doesn't matter sex, not sex. It doesn't really matter this whole idea, I suppose, of pressure or coercion. You know, if like just looking at a book would be in conflict with religious principles, that would be enough. Well, just to be clear, under Yoder, the court left open what would happen if there were kids who objected. But we know that these things, you know, schools around the country already have these very broad opt out policies across the curriculum in Hawaii for anything controversial, in Arizona for anything that parents find deemed harmful. And we just don't find these kinds of cases or these kinds of burns where parents are bringing extreme examples. You know, parents with kids really don't have a lot of time to be suing the school board, and they're looking for a reasonable compromise. I'm sorry, I have a whole list of cases where parents have objected to a biographical, I'm quoting, biographical material about women who have been recognized for achievements outside of their home, because some people believe women should not work. So too parents have objected to teachers reading books featuring divorce, interfaith marriage, or in modest stress. Forget about the evolution, because that's come too. You've just said, are these all coercive? Well, again, it's whether they whatever coercive means they do, they do could create a burden. This court has defined burden very simply that if someone is trying to exercise a sincere religious belief, and the government is prohibiting or inhibiting their ability to exercise that. If someone's prohibiting just looking at something that they object to that that's burdening their religion. Again, we don't see these cases arise in reality. For reality's sake, you see interfaith couples all the time walking around. You see interracial couples walking around. You see women on this court in positions of work outside the home. And no one here is raising a burden in that situation. We're far beyond that. But there are cases to that effect in schools. In those cases, tell me where you're going to draw the line. Other than saying that if anyone objects to a book, well, you want more than that, because the request here is to instruct the school to tell you its curricula, to guess at what you might find offensive, and then let you opt out. Because that's the injunction you're asking for, isn't it? You're asking for the ability for schools to provide you with the information about what's being taught, and if you object to it on religious grounds, to opt out. Your Honor, I see my light is on. May I answer the question? You may, yes. Your Honor, even under Yoder, without Yoder, under a Smith regime, in here, those things would trigger strict scrutiny if you're in a regime where there's direct discrimination like we have here. We have students who are being told that they can opt out for certain religious reasons, but not other religious reasons, and that's always going to get you to strict scrutiny. Thank you, Counsel. As far as simply looking at something, looking at the image of Muhammad is a serious matter for someone who follows that faith, right? That's correct, Your Honor, and Barnett already helps provide some guidance on this, that forcing people to do things that directly violate their faith violates the free exercise clause. I don't know how often it comes up in the schools, but our religion clause, jurisprudence, does have the element of sincerity. That's correct. There has to be a religious belief. It can't be just something that you disagree with for political or philosophical reasons. It must be sincere. There's also a substantiality requirement that depends on the objective pressure that the government's putting on you. All of those things provide a significant screen, and just, we know from history, from common sense and looking at what's happening in schools that have these broad opt-out policies, like Montgomery County itself had prior to this lawsuit. Anything that violated your beliefs, you could opt out, and we didn't see these kinds of, and when they have come up, courts have dealt with them in reasonable ways. Thank you, Counsel. Justice Thomas? I think you mentioned Yoder a couple of times. Would you spend a minute on how Yoder would, role it would play in our analysis or should play? Thank you, Your Honor. Yoder looked, in significant part, at the unique coercive environment of the public schools. It referred to the hydraulic insistence on conformity that you find in schools and removing children from their parents for eight hours a day. Here we have a situation that's even more egregious than in Yoder, where you have children of an extremely young age being indoctrinated in a topic that's known to be sensitive. Every school in the country allows opt-outs since sex ed has been introduced. Unique because of its capacity to evoke curiosity in children and a curriculum that's designed to disrupt students' either or thinking on sexuality and gender identity. In Yoder, you had incidental encounters with values that were contrary to those of the Amish. And so, in many ways, this case is easier than Yoder. Whose interests are we concerned with here? Is it the interests of the children or is it the interests of the parents? Thank you, Your Honor. We have named children, but for the preliminary injunction, which again was filed two years ago, we have raised the rights of the parents. Justice Alito? You've made a very broad argument here at times, and it might be good, it might not be good, but let's focus on what's actually at issue in this particular case. What are the ages of the children who are involved here? These books were approved for pre-K, which in Montgomery County can start as early as if they're going to turn four that fall. And it goes up to what? The books that we've all talked about go through grade six. All right, so you're talking about children maybe in the age of five to 11 or four to 11. Now, would you agree that at a certain age, students are capable of understanding this point, which probably is not a point that can be understood by a four- or five-year-old. That is that my teacher, who is generally telling me that certain things are right and certain things are wrong, isn't necessarily going to be correct on everything. It is possible for me to disagree with him or her on certain subjects. Would you agree that there comes a point when a student is able to make that distinction? That's right, and many of our clients' objections would be diminished as their children got older, but here we're in a situation where Montgomery County's own principals objected that these books were inappropriate for the age, that they were dismissive of religion and shaming toward children who disagree. The board itself withdrew two of the books for what it said were content concerns because it finally agreed that what parents and its own principals were saying was accurate. And one final factor that may distinguish this particular case from some of the others that you have been asked to express a view about, and you did touch on this, is the fact that it concerns sex and gender, and that the Maryland legislature itself has recognized these subjects raise special concerns and has provided for an opt-out from the health classes where these matters are discussed. That's right, and currently in Montgomery County you can opt out from the very same instruction during health class, but then you're required to stay during story time. Thank you. Counsel, a couple of questions to clarify things. Uncle Bob's wedding, the child character, wasn't objecting to same-sex marriage. She was objecting to the fact that marriage would take her uncle away from spending more time with her, correct? Again, courts would be engaged in religious discrimination. I'm asking you to answer my question. It wasn't that she was objecting to gay marriage, qua gay marriage, period. She was objecting to having her uncle's time taken by someone else. I'm not sure that's correct, Your Honor. I think for a child of that age, it's hard to express what their actual concerns are. Well, when the character says, he'll have less time for me, it seems self-evident, isn't it? You know, Your Honor, again, Montgomery County's own principles objected to this. All right, now let's go back to this question of age, okay, and what teachers are saying or not saying. Do you want a special rule for children between kindergarten and sixth grade? Well, if the court wanted to go there, that certainly would make common sense. Parents everywhere know that children are especially vulnerable. Where in our case law would you see that as just mere age is coercion? Exposure is mere coercion of a certain age. Well, this court has frequently recognized that, for example, children lack the maturity to make decisions, to discern sometimes between truth and error, to weigh what their parents are saying versus what their teachers are saying. So if some of this objection, you said you don't have an objection to showing an interracial marriage, you don't have an objection, qua objection, to merely gay couples shown to marrying, as long as you don't have approval of that, is that what you would object to? Well, Your Honor, again, it would depend on the individual's beliefs. And this court has already held, for example, in Bob's... So if none of the, all of the parents, many of the affidavits that the parents put here said they don't mind teaching respect and kindness towards people who are different, the objections appear to be with some of the teacher instructions, the ones having to do with altering the mindset of children, or the ones talking about gender being a guess at birth. Those were the things that I saw the parents objecting to. The parents object to the books and to the instructions. There's no question that together, and even separately, the books go to indoctrination more than exposure. We can look to the record for that, correct? I'm sorry? We can look to the record for that. That's correct. Thank you. Justice Kagan? I wanted to take you back to some of the questions that Justice Alito was asking, because I too was struck by, these are, you know, young kids, picture books, and on matters concerning sexuality. I suspect there are a lot of non-religious parents who weren't all that thrilled about this. And then you, you know, add in religion, and that's, you know, even more serious. But I guess I'm searching for what in your legal arguments would allow us to draw lines in this area. And I'm kind of not finding it from what you were saying to me in our earlier, or what you said to Justice Alito, because when Justice Alito said, how about that 17-year-old, you said, well, many parents' objections would decrease. But that still indicates that if a parent said, no, even with respect to that 17-year-old, I still care about this. I want an opt-out. You're not giving anything that would allow lines to be drawn. And I'm just curious if you think lines can be drawn, and where they would be drawn, and on the basis of what First Amendment doctrine they would be drawn. We think there are lines that can be drawn. They're the same lines that this Court has drawn in every other free exercise case. And the burden of a plaintiff has to show that its beliefs are religious, that they are sincere. There has to be a substantial infringement or burden or pressure. And then on the strict scrutiny side, there are also— But I'm hearing you saying that the burden that you're saying, and of course, we're just assuming that all these people have sincere religious beliefs. Let's just assume that. But what I'm hearing you saying is the burden is basically up to the parent to decide, this conflicts with my religious beliefs. I want an opt-out. Is that correct? Yes. And on the Sherbert side, under strict scrutiny, they would have to first show that there is a law that's not neutral or generally applicable. So there's a limit there. And on the Yoder side, that this Court didn't want to go all the way to address the issues that aren't present in this case. It could rely on a uniquely coerced environment of the schools. And now putting those kinds of issues on the burden side— But still, it's like just putting—I mean, I'm really searching for something. And I know that you realize that. And you're still not giving me anything other than if it's in a school and a sincere religious parent has an objection, that objection is always going to result in an opt-out. No matter what the instruction is like, no matter what the materials are, no matter how old the kids are. And that's the rule that schools everywhere in the country are working under right now by their own choice. That was Montgomery County's own rule before this lawsuit came in. And there were never these kinds of problems until it really introduced a curriculum that was clearly indoctrinating the students. And things that the principal said was introducing things as fact that aren't fact. Yeah, but once we articulate a rule like that, you're going to have a lot of parents, it seems to me. I don't think you can say just because it hasn't happened. Once we say something like what you are asking us to say, it'll be like, you know, opt-outs for everyone. Well, certainly the government always wants to put these things on the burden side instead of the strict scrutiny side. We heard these arguments in Hobby Lobby where there was a lot of concerns about what would happen in Ocentra, what would happen with drugs. And in reality, we didn't see those kinds of floods happen. And when they have, the courts have managed to deal with them without any significant difficulty. Thank you. Justice Gorsuch? You've spoken a little bit about Yoder today. I'd like to hear your thoughts about the Smith side of the argument. And the Fourth Circuit's suggestion, I think it's a fair reading of the Finopa. Maybe not. I'd like both sides to think about this. Whether if you fail Smith's neutral and generally applicable rule, whether a plaintiff still has to show a substantial burden or whether you go straight to strict scrutiny. I think you would just have to go. I mean, I think at that point, if you've shown lack of neutrality and general applicability, you would still have to have an injury, maybe some for constitutional Article 3 purposes. Exactly. But do you have to show a substantial burden or is that law that is not neutral, that discriminates against religion? Does that go straight to scrutiny? I think the standing injury would be sufficient. And here's an example why. If you look at the board, for example, revised diversity guidelines, they try to draw a line between curricular activities and extracurricular activities. Yet they also say, and this is at 674 of the appendix, that you can opt out of inquire or ban if you object to the religious song. And is that curricular or extracurricular? They also say on the extracurricular side, you can opt out from things like Valentine's Day if you don't like the religious overtones of that holiday. But when Sherwood Elementary School announced that it was going to read one book of the inclusivity books every day in June for the month of June to celebrate Pride Month, you couldn't opt out. So there's this discrimination where some religious reasons get opted out, some don't. There's these labels about curricular, extracurricular, English and language arts versus health. But in the end, it's the same thing. Some students are getting opt-outs and some aren't. That discrimination alone is a burden that gets us to strict scrutiny. This is Kevin. A few questions. What's your understanding of how the surrounding counties are dealing with this? Frederick County, Howard County, Prince George's County, Anne Arundel County and the like. Yeah, Carroll County, for example, has taken the position that it will teach inclusivity without indoctrinating students. And so it's not introducing this ideology, extreme ideology about gender, whether your body says anything about your gender, whether doctors guessed at your sex, whether your pronouns change day to day based on the weather or not, whether you should petition for unisex bathrooms. It's teaching inclusivity without that indoctrination. And our clients agree. Every student deserves to be respected and loved, and nobody disagrees with that. But you don't do that by forcing others. In fact, religion is another one of the categories and the equity regulation is required to be respected. The principals, when they first responded to this curriculum, their concern was for the religious students, that they were going to be dismissed and shamed for their beliefs. And I think you just said this, but you're not seeking to prohibit instruction in the classroom. You're just seeking not to be forced to participate in that instruction. That's correct. The term coercive, I think, has been used in some of the colloquy, but the right term is burden. Isn't that correct? That's correct, Your Honor. And if you think about their example of saying like the court, the Fourth Circuit said that, you know, the students were never asked to change their religious beliefs. Is it enough if you just ask them, will you change your religious beliefs? Or does there have to be something more? That is really not a workable standard. And I, you know, schools should not be treated differently than any other government entity as far as what their obligation is. And it somewhat flips the Bill of Rights on its head if we're worried more about extreme examples that don't happen to protect the government from the parents, as opposed to protecting the parents' fundamental rights to direct the religious upbringing of their children. And then in terms of sincerity, in other words, if you're lying about your religious belief, that can be inquired into, but not the legitimacy, the reasonableness, the acceptability, the consistency, none of that. The court has no business questioning any of that about someone's religious beliefs, as I understand our case law. That's right, Your Honor. In this case, again, the fact that the board has admitted that they would give opt-outs to Muslims who object to their children viewing an image of the Prophet Muhammad, but not our Muslim clients who object to their students reading these books, shows that that kind of analysis would entangle courts in religious questions and invite religious discrimination. And then I guess I am a bit mystified, as a lifelong resident of the county, how it came to this. Can you just tell us what happened in March of 23? You know, what happened in terms of the objections and how the school board responded to give us a little bit? Well, I share your concern. My kids graduated too. My kids graduated from MoCo and were opted out when they asked on their own accord to adopt out of some instruction on sex education. And what happened is, we're not even entirely sure, because for the entire first year, the board promised in multiple places, on Fox News and other media, that parents would be notified and then they would be opted out. The last notice happened on March 22, 2023. The very next day, overnight, with no explanation, the board came out and said, we're changing the rule because we want every, all students to be instructed on inclusivity. That's at 547 in the appendix. That emphasis on all students have to receive this instruction. Nothing about administrability. And then from there on, even then they said, if we've already told you you can opt out, we'll let you do that, but more parents can't ask. And then it wasn't until later in the year when they actually revised their guidelines, which still allow certain religious opt outs and just not others. This was clearly targeted at religious parents. But then complaints were raised, right? That's right. Hundreds of parents complained. These were mostly, according to news articles, mostly families from Muslim faith and Ethiopian Orthodox who were objecting when they spoke to the board. The board accused them of using their religious beliefs as another reason to hate, accused a young Muslim girl of parroting her parents' dogma, and then accused the parents of aligning with racist xenophobes and white supremacists. And so, again, there's no question in this case that there is a burden, that it was imposed with animosity, and that it's discriminating against our clients because of their religious beliefs. Justice Barrett. So, counsel, we've talked a lot about burden, and I'd like to get a definition. So Justice Sotomayor's questions, I think, track what the Fourth Circuit said, which is that compulsion is required. That's not your position, that compulsion is too far, right? So can you precisely define for me what it means to have a burden? Yes, I think there's three main ways this court has reviewed that. Under Yoder, it would be, is there substantial interference with the parents' ability to direct the religious upbringing of their children? We think we've shown that here. Under cases like Sherbert that have continued through Fulton, it's, are the parents being pressured to abandon or modify their religious beliefs in order to access a public benefit, like public education? And then I think we also have, what I think Justice Gorsuch may have been suggesting, if there's straight-up discrimination, where some religious students are opted out and others aren't, then that itself would also be a burden. And I think we satisfy any one of those tests. Okay, I have questions for you about those tests, but I'm gonna bracket them to just follow up on the burden question. Substantial interference from Yoder. So would you say you could root it in that because it's rooted in the case? Is it somehow rooted in the definition of prohibit in the First Amendment? Because it seems to me that the questions that you're getting are about line drawing. I mean, Justice Kagan was making this point. And one place where some of that line drawing might happen is in the definition of burden. So I think the definition of burden is important. And really, that's the main thing that's before us. The question of whether you get an opt-out. Opt-out really goes to the Smith analysis or strict scrutiny under Yoder. We don't even have to decide that, right? We don't have to decide whether you get the opt-out. We just have to decide if the Fourth Circuit accurately defined what a burden is. I mean, the court doesn't have to. It's true. I think there are multiple reasons why this court should. I know you want us to, but we don't have to. Really, what we have to do is nail down what it means to burden the right, right? That's correct. Okay. So unreasonable interference, and you would root that primarily in Yoder for that strain of the doctrine.  Okay. Now, what kind of a claim are you bringing? Are you bringing a hybrid rights claim for purposes of Yoder? Are you kind of bringing all of them, like a straight-up free exercise claim, a Smith claim? I mean, it's a little bit hard to pin down. Yeah, I think we're bringing all of them. We think in Smith, the court said that Yoder fell outside of its rule. Excuse me. And so we think that that's a separate track. And whatever the court meant by hybrid rights or other rights that were at issue in Yoder, we have those same here, however you define that. This is almost exactly the same situation where parents are concerned about what their children are being taught in the highly coercive environment of the public schools. And here we have, even more egregiously, the curriculum designed. The board said, when you select these books, we want you to select books that will disrupt cis-normativity, disrupt heteronormativity. And so we think that whatever Smith meant by hybrid rights that may have been at issue in Yoder, we meet that definition. Do we have to embrace the hybrid rights theory in order to analyze your claim or your definition of burden for purposes of Yoder? Do we have to say, Yoder is about hybrid rights and this is why you satisfied? I don't think so, Your Honor. This court recently, as in Espinoza, recognized Yoder as a case being about the free exercise right of parents. The questions presented in Yoder were all about free exercise. And so I don't think that any side statements that were made in Smith have to govern how this court treats that rule here. OK. And now let me ask you about the burden in this case. So there's been a lot of talk about exposure. The Fourth Circuit said this is just about exposure. You've pointed out that in cases like intersection allies, there's actually, in the book, it presents a worldview, right? And it says, let's disrupt the norms, that book. Let's disrupt the norms. And in many of the books, it's not just pictures. It's actually the text. It's talking about there are not just two genders, embracing non-binary and pronouns, et cetera. So that's exposure, though, to those ideas. It's not just exposure to the pictures of the two men getting married. It's exposure to the ideas. That's correct. But to clarify, what are your clients objecting to? Are they objecting only to exposure? Or are they objecting to what they're calling indoctrination? If by exposure, you mean having the books read to them, they do object to that. They're not objecting to the books being on the shelf or available in the library without a teacher requiring them to read it or reading it to them. So you would not be making the same claim based on your client's religious beliefs if they were just on the shelves or just in the library? Correct. Could another parent bring that claim? I suppose they could. But then you would, I mean, again, we don't see these kinds of claims happening. But they would almost certainly lose because strict scrutiny would easily be satisfied if every student were allowed to say, I want this book or not that book. No student has the right to tell the school which books to choose or what curriculum to teach or what other students will have to learn. And so we think those would easily fail under strict scrutiny. OK, so it's not about exposure. It's not about books on the shelf. It's not about books in the library. It's about actually reading the books with the text that communicates the ideas that are contrary to your client's sincerely held religious beliefs. Right. Their belief, they follow, for example, the papal exhortation under familiar consortia that they shouldn't expose their children during their innocent years to instruction on sex that's disconnected or disassociated from moral principles. And so that's what they're, and the Mahmood family, they also have an objection to any kind of discussion for young children outside of their family circle, as do many families, as the course noted. OK, and so I want to talk about the public benefit analysis. So the government frames this in terms of public education as a public benefit. And your friends on the other side do, too. And I'm just trying to figure out if that's the right way to think about this, because in Maryland, you're compelled to send your children to public schools. And it's a misdemeanor if you don't. And you're fined if you don't. And it's true that the statute gives you an exemption to that compulsion if you choose homeschooling or private school and, what is it, like thorough and comparable instruction. But this isn't like a public benefit like we apply for rubber tires for our playground, or we apply for a license to engage in some kind of activity. There's actually a compulsion here. So is public benefit the right way to think about this? Well, I think if the court does think about in that context, it's a much more valuable benefit than just getting access to rubber tires or some of the other things this court has found burdened religion. And so, but also, I think the coercive element is adequate for this court to reach a conclusion in favor of my claim. Well, which way do you think it fits better? I mean, you're compelled to send your child to public school and paying a fine unless you take advantage of an exemption. So it's just hard for me to see how it's a public benefit in the same way that some of our cases have talked about public benefits. So which model? I mean, I understand you don't want to disclaim public benefit, but which way do you think it fits? Well, I think certainly the Barnett example is a very good example of where you're actually compelling children to do things that are against their beliefs. And I think that would be, that's a very fitting model for this case. Okay. Thank you. Justice Jackson. So I guess I, your colloquy with Justice Barrett makes me wonder whether this case is really the right vehicle to evaluate any of these issues. How can we say that you meet any definition of the burdens, Justice Barrett went over several different versions of them, when we don't even know how these books are actually being used in the classroom. I mean, this was what I understood the Fourth Circuit's primary holding to be, that the record is threadbare. It contains no information about how any teacher or school employee has actually used any of the books or what any child has been taught in conjunction with their use. And it seems that aspects of your argument are turning on whether the books are just on the shelves or whether students are being taught. And so why wouldn't we wait until we have a record regarding those things before we make any legal pronouncements about what's happening in this case? Well, two responses, Your Honor. First, this is a preliminary injunction, but if you think about the case, for example, Brown versus, you know, Hot, Sexy, and Safe, is that, and I don't even want to describe what happened in that case, but should that kind of graphic sex simulation with a student as a teacher have to happen before you bring a claim? But I need you to focus on my question. This is a preliminary injunction. I appreciate that. When you seek a preliminary injunction, you actually have to have a factual record that is the basis for the court to make a determination in your favor that some conduct that you're complaining about needs to be enjoined. And what's confusing to me and hard, really hard in this situation is that we have a lot of sincerely held beliefs and concerns and children and principles, and I see all of those things. And so I really want to be careful about making the pronouncement that relates to this. I don't understand how we can do it on this record because we can't know. We don't at this moment, based on the record you've provided, know that these books aren't just sitting on the shelves. And you said that if that's the case, that's not going to be enough. I disagree, Your Honor. The record is undisputed. And I, again, will refer you to the district court transcript at 63, where counsel said- So you're saying the Fourth Circuit is wrong when it says, quote, we don't have any information about how any teacher or school employee has actually used any of the books? The Court of Appeals did not dispute that some of the books have to be used. And we have all of the- No, I understand that. I understand that. But the Fourth Circuit made a ruling that we don't know, quote, what any child has been taught in conjunction with their use. So are you saying that you do have affidavits and information about teachers in the classroom and what they've taught children of different ages about these books? Yes, we do. That all of our clients have, in their declarations, they describe which books are going to be read to their children- Were the clients in the classroom? They were not in the classroom, but they know. And again, we don't have to wait until the injury has happened to get relief. The point of a preliminary injunction is that we can, when the injury is imminent, we can seek relief- All right, let me ask you another- Or our children's- Let me ask you another series of questions, because I'm just trying to understand the implications of the rule that you want us to reach on this record where we're not really sure what's going on. Is your argument actually confined to the content of the school's  I mean, I appreciate that you say we're in the public school. This is a uniquely coercive environment. But what if we have a teacher who is gay and has a photo of a wedding on her desk? Is a parent able or could they opt out of having their student be in that classroom? Well, we think no, because the student may claim a burden. But on the question of the student doesn't have the right to tell a teacher what to say, the teacher has speech rights- But I guess I don't understand that, given your argument. I mean, so example one, we have a gay teacher in the classroom and they have a wedding photo on their desk. And the children are exposed, then, to the same kinds of picture that you say is in the book that you don't want children to be exposed to. What about the teacher showing pictures from the wedding or the teacher goes off to get married and comes back and talks about their spouse? Do we have opt out provisions for children in that situation? Again, we think the same rules would apply. And if you were in a system- The same rules would apply. So this is not just about books. This is about exposure to people of different sexual orientations and the objection, the sincerely held objection, that children shouldn't be exposed to this. Again, our clients are not raising those. And we know that these kinds of objections aren't happening. Here, the board is imposing indoctrination on children. What if a student group puts up love is love posters around the school featuring same-sex couples or trans youth? Do parents have to notice of this and the ability to opt their children out of going into the parts of the school where these posters are? Again, we don't think that any child has the right to dictate what the school does or what other students say- No, they're not dictating. They just want to opt out. They don't want their children walking in- We think they would lose in that situation. Why? What about your principle does not also mean that if we have a section of the school with love is love posters and children who have to go through there, what about your principle says that a religious parent shouldn't be able to say, I don't want my kid walking in that part of the school? Well, they would lose because the strict scrutiny analysis would favor the board in that situation because it would be impossible for the board to satisfy every student's needs about what's on the board. Now, if you're in a situation- Impossible for them to actually implement and opt out in that situation? That's right. If the request, for example, is so broad, like it was in Yoder, that the only option is for the students to be removed from the school entirely, that would be then the least restrictive means available. So under normal strict scrutiny analysis, these things- Can I give you one more? What about a trans student in the classroom? There's a student who's in the class. Must the teacher notify the parents of the student's existence and give them an opt out to not be in the same classroom with this child? No, and we've never said that there's an independent right to be noted for schools to anticipate what parents might object to, but when parents know something, there could be a sincere religious burden. Yes, a parent knows. The child comes home and says, there is a transgender child in my classroom, and I know what you've taught me in terms of religious teachings. I object to that. Parent knows. Can a parent insist that the school allow the child- Again, we think the parents would lose in that context. All right, let me ask you one other set of questions about coercion, because Justice Kavanaugh points out that the test is burden. I had understood that the way in which this court analyzed burden in these kinds of cases is to look to coercion. There really aren't a separate thing, and I guess what I'm really puzzling over is that it seems to me that coercion in this context is actually operating at two different levels, and that we have to really focus on that in order to understand what's happening. One is to the students in the classroom, the coercion of being forced to be exposed to these kinds of materials or these kinds of things, or can they opt out? But I think there's another coercion, and you've touched on it a little bit, and that is assuming that there's no opt-out in this environment, are students being coerced into being in that school at all? And I think those two different ways are really, really important. I mean, as I read our cases, we could have set up a constitutional framework in which all students are required to attend public school. They have to go to public school, and I think in that situation, you would have a pretty strong argument that it burdens a parent's religious exercise if the public school teaches children things that contradict the parent's religious beliefs. Here I am, I'm a religious parent, I have to put my kid in this school, and when my kid goes there, he's learning all sorts of things that I'm saying against my religious belief. I get that. But what do we do about the world that we're actually in, which is where Pierce says that the parent can choose to put their kid elsewhere, that you don't have to send your kid to public school? In that situation, I guess I'm struggling to see how it burdens a parent's religious exercise if the school teaches something that the parent disagrees with. You have a choice. You don't have to send your kid to that school. You can put them in another situation. You can homeschool them. How is it a burden on the parent if they have the option to send their kid elsewhere? Well, Your Honor, the world we live in in this case is that most parents don't have that option. They have two working parents. Yes, as a matter of practicality. Absolutely. And that's the reality for our parents. I understand, but in so many other constitutional doctrines, we don't focus on whether people actually can afford to protect their rights. Well, here there are so many other doctrines. There are so many other doctrines to pay for the public school. I understand, but usually we set aside and we say, but you still have the right to get an attorney in a civil case, even if you can't afford it, right? So we don't focus on whether or not they can actually do it. They have an option. And what I guess I'm worried about is a world in which when there is an option to send your kid somewhere else, it seems to me that these parents would be dictating what this school does in the way that you say our cases say they can't do, right? In Carson v. Folden, this court never required coercion. The parents were already paying tuition to go to the school. In all those cases, Lacumi, the schools didn't really need tires. They weren't being coerced to do anything. This court has always sent Sherbert, Adele Sherbert, Thomas. They weren't being coerced to do anything. They just were being pressured to violate the religious beliefs in order to access the benefit that's much less value than education. Thank you, counsel. Ms. Harris. Mr. Chief Justice, and may it please the court. When the government forces people to choose between violating sincerely held religious beliefs or forgoing a public benefit, that burdens religious exercise. In Fulton, offering foster care contracts only to groups that would certify same-sex couples burden groups that believe marriage is only between a man and a woman. In Sherbert, offering unemployment benefits only to people willing to work Saturdays burden those for whom Saturday is a Sabbath. Here, Montgomery County offers a free public education to parents only if their children use books featuring same-sex relationships and transgender issues. That burdens parents of multiple faiths whose religious duty is to shield their young children from such content. Public schools routinely accommodate those burdens with opt-outs, which respect families of many faiths and backgrounds. Several states allow opt-outs from any learning material on religious grounds. Montgomery County allows many other opt-outs, just not here. I welcome the court's questions. Ms. Harris, is there any daylight between your argument and petitioner's argument? Only as a matter of emphasis. I think they're making a more varied range of arguments with respect to sort of parental rights as potentially a separate strain. Here, I think we all agree that certainly one framework and the framework we're advocating for is to view this as putting a price on a public benefit of public education at the expense of forgoing a religious belief. Petitioners agree with that. And we agree with petitioners that the fact that there is a long history of parents controlling the religious upbringing of their children in the school context is, if anything, just illustrates exactly why there's an obvious burden here. What role does Yoder play in your analysis? Yoder is a textbook example of parents being forced to choose between paying a price, which is having to face severe sanctions, potential sanctions, for not sending their children to school, or being able to exercise their faith by preserving their children, their teenagers, from being exposed to worldly influences. And again, that was contrary to the Amish faith, which prescribed that at ages 14 and older, that's the critical time for children to be closer to home and not be exposed to the worldly influences of high school. So I think we're on all fours with Yoder. If, you know, the idea that we're just talking about mere exposure here, that is not something that would be cognizable to sort of run flat in the face of that decision. Your approach focuses on, as articulated, sincere religious beliefs. How do you measure whether a belief is sincere or not? Based on this court's cases, it's whether someone is expressing their understanding of what their religion entails. Thomas, I think, is this court's sort of canonical description of what it entails. You don't ask, does the majority of people of your faith agree with you? You're just saying, does someone, based on their understanding of what their religion is, believe this? And they're not, you know, they're not making false representations. And I think that's how this court has consistently applied the Sincerely Held Religious Beliefs test. And there's no question in this case that petitioners would qualify. I don't think anyone has challenged the sincerity of their views. Is there an example in this particular case of a articulated religious belief being rejected as insincere? In this particular case, no. I don't think there is an example of that. Ms. Harris, you've heard the discussion so far, and it's focused in part on what qualifies as a substantial burden. At one end, you know, you might imagine a book being in a library. At the extreme other end, you might imagine a teacher coercing a student to write a certain passage or do a certain thing that's contrary to their religious beliefs. Where in that spectrum do you fall? We might not even fall on the spectrum, because I think the question is not, are you objectively looking at the world and asking how does a child of a particular age or outlook feel about a particular encounter with a teacher or a particular material? It is, in the first instance, do parents have a Sincerely Held Religious Belief that their faith obligates them to shield children from particular material? And I think that's important, because if you take the opposite approach and say, you know, people should get in the business of thinking about, are four-year-olds more susceptible? Are 16-year-olds sort of insulated? You start slicing and dicing among different faiths. You say that faiths that believe that four-year-olds must be shielded might have a better right or better free exercise right than the Amish who believe, for instance, that it's actually 14 that matters for their faith to shield people. And so I think that concern with religious discrimination is really, really important in terms of the first step of defining the divergent. But if it's all about a Sincerely Religious Parent wanting to shield her child, then to might be thought, on some views, as one end of the spectrum, you know, a book in the library, right? And they say, well, my kid is not shielded from this book because, you know, there's library free time, and she could find this book on the library shelves. What would you do with that? Right. So what we do with this is twofold. One is I think you have a threshold state action question with respect to like whether it's the child finding it, whether it's the school making it available. The school making it available. The school is like, you know, deciding how to spend their money and which books to buy.  But I'll tell you that, just setting that aside, I think those kinds of questions do cash out, as petitioners are saying, with respect to if you get past Smith, you end up in Smith, assuming that you are in strict scrutiny world, depending on the nature of like whether the library allows opt outs or not. I think it does cash out in strict scrutiny, because we agree with it. If you would get to strict scrutiny, that sort of counts just because you find some kind of conflict of religious parents saying, no, I don't. My kid would not be shielded from something that is in conflict with my religion. And so the only way for a school to win that is in strict scrutiny land. Well, no, I think the school could win in a couple of ways. One is if they have a generally applicable policy, they don't allow opt outs for anything. Obviously, they could be outside of they could be in Smith world. But assuming we're in strict scrutiny world, this is how things work. I think the way that it works is are you saying that children that schools have to operate as sort of policemen to make sure that there's no child at any point in the day who might run into a book or pages of a book that violate their parents' religious obligations. And I think then you're just in the same territory as the United States versus Lee or in Fulton or in other cases that say at the point where you have a combination of you're essentially forcing the school or the institution to shoulder the burdens of reworking the institution and essentially giving that one person a right to restructure it for everyone else. That's not the kind of accommodation that is permissible under strict scrutiny. United States v. Lee is a good example where for the income tax. I'm sorry. Go ahead. Sorry. Income tax. Everyone accepted that the Amish carpenter at issue in Lee had a sincerely held religion religious objection to Social Security taxes, not part of their faith. But the court said, no, you can't just say that you get to ensure that everyone else doesn't pay their taxes or that you get to essentially rewrite the income tax to everyone because you can't have a sort of system like that. Now, we're in the opposite of that world here because opt outs with respect to pieces of instruction, the entire curriculum, with respect to extracurriculars, with respect to everything else, are a sort of very traditional feature of public schools. And indeed, the means with respect to all of those things that you just said, curricular instruction, extracurriculars, blah, blah, blah. That does not raise the Lee issue in your mind. You know, there the opt out is necessary. You know, whatever you might think about, you know, this is about the kids age, about the nature of the instruction, about anything else. That's where we think we draw the line. And I guess I mean, there is a line then. No, no, I think that absolutely is a line. I mean, I think we've heard hypotheticals with respect to can you essentially veto someone else's children being in the classroom? Can you veto a teacher being in the classroom? Can you make sure that no one else is being taught a particular book? And those, in our view, again, Fulton is a good example. What would happen if like an eight-year-old, you know, there's a part of the school day where people show and tell and talk about things that matter to them and to their families. And an eight-year-old says, I want to talk about, you know, having two moms. Would another student be able to say, I'd like to exercise my opt-out now? I don't think so. Because in that particular context, what you're talking about is other students talking. Just as if there's a lunchtime conversation among students that raises various issues, schools do not have, schools and teachers and the board are not engaged in state action just by not policing everything that any student in the school says in any part of the day. It's just what the teacher says. It's what the teacher says. And again, I guess I would take it yet a further level. So there's teacher liability. And then for the board, of course, to be liable, you have manila issues with respect to whether it's a policy. And just how this works out practically, teachers... And do you think it's okay, Mr. Baxter's answered one of my questions. He said, you know, he has no objection to the fact that, you know, the school would say, well, you know, you should leave the room. And then if the next thing is, I don't want to leave the room. I want to be in the room, you know, in the same way as everybody else is. I just don't want them to be talking about that. Does that, is that a claim? We agree with petitioners. That would be the, that's just the same version of the veto that we already talked about. That's not a permissible, that would fail under strict scrutiny. That's not how opt-out works. And I think it's very telling. Because the person could say, like, I'm not getting the same education, the same public good as everybody else's because I have to leave the room. And I don't think that happens as a matter of practice. And the reason is, again, you have five states ranging from Pennsylvania to Arizona, Utah, Hawaii, Minnesota, that have very broad opt-outs, even broader than any sort of constitutional rule being proposed here. And you don't see people saying, I have a sort of right under a state law action to like a, not have this particular opt-out operate that way. The way these have always worked is you either are sort of outside for a brief period of time, or you're offered some sort of alternative. And again, this is not something that's hard for schools. It's something that schools have done for a long time. It is not a sea change. And respondents have the same problem, which is, if you accept that it is some sort of level of compulsion that triggers it, they're accepting the same whole series of opt-outs and alternatives too. Thank you, counsel. Justice Thomas, any further? Justice Alito? Justice Sotomayor? Here, sought by defendants, asked for two things. Parents noticing an opportunity to opt their children out of reading, listening to, or discussing the Pride storybooks. The injunction presumably would require what you say is not required, to take the books off the shelf, correct? No, I don't think that's what they're requesting at all. And petitioners seem to have disclaimed that. Petitioners are saying they would like the ability to, they basically want the- To opt out from forcing the child to read the book. So they want- Because that's the words used here. Yes, they want the child to be outside of the classroom if they are exposed to the book. They want the status quo ante that Montgomery County previously offered. All right. So, but you're not objecting either to having the books on the bookshelf in the classroom? We don't understand that to be the claim here. All right. Now, they also asked the court to, quote, enjoin defendants from denying them advanced notice and opportunity to opt their children out of any other instruction related to family life or human sexuality that violates the parents or their children's religious beliefs. Is that an enforceable injunction? Is that an enforceable injunction? I don't know what related to family life would mean. It could be any picture, any book that talks about people getting married, interracial couples. I think it's defined by the contours of their particular claim and by the way in which Montgomery County and the state of Maryland have defined topics. We require injunctions to be more precise than that. I think regardless of how the court feels with respect to the specificity of this injunction, it seems pretty definite in the context of the case. And with respect to the question presented, whether there is a burden if parents are not able to have the advanced notice of opt out of the material that the religious obligations prohibit, that's a clear burden. Justice Kagan? Justice Gorsuch? The way you briefed the case, the government's briefed the case, is a public benefit case, as you discussed. Another way to think about the case, as Justice Barrett was discussing with your colleague, was through the lens of Smith and whether the county's acted neutrally pursuant to a generally applicable rule. What are your thoughts about that? We have some statements that Justice Kavanaugh referenced from board members to parents and children, and we have opt outs for all manner of other kinds of considerations for Valentine's Day and Halloween and other things. Would that be another way to approach this case? It absolutely could be. I think that the way it would work would be you would find discrimination on the basis of religion, not just that there was not a generally applicable policy. So obviously, non-generality would be enough to get you out of Smith. But I take the petitioners to be going further and saying, there's evidence in the record of more like a Lacunae-like animus type claim, where there is sort of the only explanation for the board's shift is they did not like the religious objections. They have expressed hostility in various comments to religion. So that is absolutely another pathway the court could go down. And again, we chose the public benefits path because on this particular record, it seems particularly sort of clear that parents have a sincerely held religious obligation that is being denied in this context. That would suffice to get to strict scrutiny and sort of go through the rest. Oh, sorry. I have another question.  Some lower courts have taken the view that even if you have a discrimination against religion, so you failed the Smith test, that you still have to show a burden, a substantial burden in addition to that. And one might read a footnote in the Fourth Circuit's opinion that suggests that. Do you have thoughts about that? This court has held in cases, certainly most recently, in the Trinity, Lutheran Trinity that discrimination on the basis of religion, if you are treating people of faith worse for a particular religion, worse for discriminating in the Lukumi sense, that triggers strict scrutiny. Justice Kavanaugh. Just to be clear, your position in this case is that you're not seeking to alter the instruction in the classroom or what's the content of the classroom. You're only seeking not for these children to be forced to remain in the classroom, correct? Exactly. And then if there is a substantial burden, you get to the next step of the analysis. Why do you think this is not generally applicable? Two sets of reasons. One is that it's discretionary. So by definition, it's not generally applicable. The board can turn on a dime and change who gets exemptions, what kinds of exemptions are covered. And that's, in fact, the record here, that they change overnight as to what kinds of exemptions they would allow. And two, in terms of lack of general applicability, is the patchwork of exemptions they currently allow. They allow exemptions for musical performances. They allow, I think they allow exemptions for dissection. They allow exemptions for Halloween, for birthdays, for any kind of religious observances on Saturdays or Sundays that might interfere with extracurriculars. The one thing, they allow exemptions for sexual education in the classroom components. The one thing they don't allow is the exemptions for the storybooks. And that is sort of the hallmark of something that is not a generally applicable policy. On your first point there, the alternative one about changing the policy, couldn't that be said about every policy that exists, even one that has no exemptions at all? Oh, well, they could change it tomorrow. Therefore, it's discretionary. Therefore, strict scrutiny. How would you answer that? I would answer that by saying the court has looked at sort of legislation and other sort of things that are abiding differently and said, you know, if you have a law that says there's no exceptions, it's a different situation from if the decision-maker tomorrow just retains flexibility. I mean, if you think about Fulton, the way in which the court thought about case-by-case discretion in that case, if you have a decision-maker who can just say, I'm going to end my discretion, reverse course, decide to give you a one-off opt-out or a categorical opt-out tomorrow, it seems hard to see why that would be generally applicable. And again, the fact that the board did something similar to that here. We don't need to address that here, I suppose, because of the exemptions that exist for other things makes it non-generally applicable in your view. And then on strict scrutiny, why does the county fail strict scrutiny? The county fails strict scrutiny because the question is whether the county has a compelling interest. Here, their asserted interest appears to first and foremost be in administrability and not granting opt-outs to the petitioners. That's the way the court's framed the burden analysis in Fulton and Yoder. And so it's key to a sort of not granting the exemptions. And it is very, very hard, even on this sort of preliminary injunction records, to understand why it is not administrable to offer the opt-outs in this particular context that they used to offer, but offer a host of opt-outs for virtually everything else under the sun and not have all the same concerns flooding forward, especially given that they have, in addition to the things that they have identified in their policy, conceded that they would need opt-outs for things like exposure to images of the Prophet Muhammad or any instances where classroom instruction rose to the level of compulsion under their view. And so I think their line drawing problems really would do any kind of attempt to satisfy strict scrutiny. Is the United States aware of any other school board in the country that's done something like this? We aren't. I can't vouch for it not happening. But I think more relevantly, we're aware of many, many states and school districts that take the opposite tack and allow opt-outs far beyond any kind of constitutional rule that would be adopted in this case. Thank you. Ms. Spirit? Ms. Harris, so there's a lot of concern about line drawing and what this would mean. And maybe some of that would be handled under strict scrutiny or under Smith. I mean, it's not saying that anybody wins or loses if we're just talking about initial steps. But to the point of line drawing, is there a way? Let's imagine that the court decided that there was a burden here, that a free exercise right was triggered, that the government thinks we should be careful about to not implicate other things. I'm thinking about what if a teacher was transgender and the student was very respectful to the teacher but didn't want to use the pronouns and the parents didn't want the child to use the pronouns, let's say, you know, call the teacher Mr. when she was transgender, when the teacher was transgender. Same for students in the classroom. You know, those might present different issues that would be more difficult. So is there something that the government has in mind that would be some limiting principle? Yes. So just to take the limiting principle first and then your pronoun hypothetical second. With respect to the limiting principle on what a burden is, I think it's almost this is the easy case because you have parents' religious obligations and the obligations encompass being exposed to material and it's just an outright prohibition. But I think Professor Gerges' article is actually a very good guide to different kinds of burdens that might arise in this context or others that wouldn't qualify. So take the hypothetical of parents want to opt out from school for a month to take their kids on a religious pilgrimage. If your faith is indifferent to doing so in September versus during like spring break or summer recess, you don't have a burden on your religious exercise because you have equally available alternative means of doing your religious exercise that don't require the opt out and don't really put you to the choice that we're talking about. So when you're thinking about things that aren't sort of the prohibition on exposure things, I think there are real teeth in this doctrine and there's a lot of hypotheticals that you can think of in the school context that would implicate that. With respect to your pronoun hypothetical, I actually think that's a case that raises even more concerns in the sense that you also have, and this is what the court of appeals cases bear out, potential compelled speech concerns with respect to you are requiring everyone else in the classroom, first of all, free exercise issues but also compelled speech issues to refer to a particular person by pronouns. That's how the cases are kind of getting litigated out in the lower courts right now. Thank you. Justice Jackson? I guess in following up on that, I'm just not sure I understand your answer. So is it a burden for a religious student who is being taught at home and through their religion that gender is not a situation that can be changed? People should not be in a transgender circumstance. Is it a burden for them to be in a public school classroom where the teacher is referring to another student by what this student believes is the wrong pronoun or whatever? Well, I think the relevant burden there would be the parent's religious exercise as we've conceived of the nature of the religious beliefs in this particular case. As petitioners know, you could also have questions with respect to the student's free exercise rights. I think that's a particular question. Is it a burden on the parent to have their child in a classroom with a transgender student and the teacher is referring to them by pronouns that the parent thinks is inappropriate? I mean, I think even under respondents view that that would in fact constitute a burden on religious exercise and here's why. It is a burden on religious exercise and the parent's view because not only do they have a religious obligation to ensure that their children are not sort of exposed to the idea that you must sort of recognize people's pronouns in that particular way, but I think even under respondents view, there's a level of compulsion or affirmation of a particular view of how someone's pronouns should work. And it doesn't matter that the parent could send their kid to a different school because they don't like this environment. I mean, you agree that they're not being compelled to actually go to that school where this sort of thing is happening that they disagree with. I think two points on that. One is that actually shows the burden because you're being forced to forgo the benefit of a public education. Well, we'll get to that. I'm just trying to understand. So you're saying even if the parent has a choice to put their kid in another environment that doesn't do the kind of thing that they object to, it's still a burden if they opt to put their child in this environment? Absolutely, unless you want to overturn Burnett because Burnett, too, I think had that same choice. Let me ask you about just following up on that choice. So is it really confined to the public school context? So in that same scenario about foregoing a benefit, what if the government puts up ads on public transportation that informs the public that the clerk's office, the government's clerk's office performs and certifies gay marriages? And this is on a bus. This is on the subway. And children can see these ads that are talking about state-sponsored gay marriages. And what I guess I'm trying to understand from your argument is whether it substantially burdens the religious exercise of parents whose religions teach that marriage is between a man and a woman to ride on those, to have those ads displayed on public transportation. Yeah, I would just add caveats with respect to how the government speech inquiry would sort of cash out in that context and what kinds of challenges you can bring to transit. But I would just say as a more general matter, our position is not limited to the idea that if there are other contexts, I mean, if there are other contexts, like take Bowen, where you're being forced to use Social Security numbers by the government and that violates No, I want this context. Okay, the answer is going to be yes in terms of the context. So I don't understand how that squares with our cases about not making the government change its position or do things just because of your religion. I mean, we have a public bus and the person can choose not to ride the bus if they don't want their children exposed to the ads that are on the bus. But you seem to be saying that because the bus is a public good, the religious parent has the right to tell the bus people and the state that they have to take those ads down because they don't want their children to be exposed. I should be more precise in terms of how I'm answering the hypothetical versus the general extension of the cases outside the school context. We obviously think that the range of you can't be forced to forgo a public benefit extends beyond the school context because the responders are asking for the reverse. They can find it everywhere except for the school context. With respect to your hypothetical, I think you're getting into the question of how far the link decision extends with respect to government property. I'm just trying to find a public benefit. You have schools you say is a public benefit that parents are being forced in a way to give up if they want to have an environment that their children are not exposed to these sorts of ideas. I'm just trying to find an analogous public benefit outside of the school context and ask you whether your position is that it substantially burdens the rights of religious parents if there are advertisements on a public bus that say things that they don't want their children exposed to. So again, I think at the first stage of the burden inquiry, it depends on whether you're in the wing category of cases where you're saying I'm essentially burdened by something that's on government property or you're in this sort of stage here where we're not talking about that context. But just to abstract, outside of that, there are obviously going to be contexts besides the school context in which we would agree that there is a burden. Again, I think Bowen is really the best example where parents would be, if you take the Bowen hypothetical that was reserved, parents are forced to use social security numbers to get benefits, right, to apply for various things. That burden is a religious exercise. So yes, it applies in those contexts. But I think that's sort of a feature of this court's jurisprudence because this court has not said that public benefits can't be burdened. It isn't a feature of our jurisprudence that we haven't said before that mere exposure to these sorts of things create burdens. I mean, I understand that most of our jurisprudence in this area is about forcing people to affirm, you know, the Pledge of Allegiance, forcing people to go to the public school. It would be one thing if the state, in my hypothetical, said everybody has to ride this bus, just like the state used to say everybody has to go to public school, the Amish have to go to public school past 16. But if you have an option to do something else, I guess I'm just worried about suggesting that exposure to things you disagree with in a situation in which you have an option not to expose yourself to that because you can do something else counts from the standpoint of substantial burden. So two points. One is, I think there's two concepts in here. One is with respect to the concept of, like, quote, unquote, mere exposure versus belief. I think that line is not a line that can be held without discriminating on the basis of religion. I think if you had a situation where, let's say, Ms. Sherbert believed that she couldn't view images of the Prophet Muhammad as the only options for her Saturday employment for whatever reason involved seeing that or involved employment that would have violated her obligation not to view other things that are relatively objectionable to her different faiths, I think it would be the same setup. Wouldn't matter that it's unemployment benefits versus a school context. Now, second issue with respect to, can you avoid it through other means? I think this court in Fulton confronted a very similar situation. The court did not say, Catholic social services, you have a mission that's religiously motivated of making sure you provide for the needy of Philadelphia. Instead of doing so through foster care placements, you have lots of other ways to serve those children to go off and do so even though the only means of serving foster care children through Philadelphia required violating their sincerely held religious beliefs in terms of affirming same sex marriage. Thank you. Thank you, counsel. Mr. Schoenfeld? Mr. Chief Justice, and may it please the court. Every day in public elementary school classrooms across the country, children are taught ideas that conflict with their family's religious beliefs. Children encounter real and fictional women who forego motherhood and work outside the  Children read books valorizing our nation's veterans who fought in violent wars. And children in Montgomery County read books introducing them to LGBT characters. Each of these things is deeply offensive to some people of faith. But learning about them is not a legally cognizable burden on free exercise. Adopting petitioners view of the case would conscript courts into playing the role of school board, a task for which this court has recognized they are ill-suited. And a constitutional requirement to provide opt-outs from anything someone finds religiously offensive would mean public schools must find alternative classrooms, supervision for young students, and substitute lessons each time a potentially offensive topic arises. That is not what the Constitution requires, particularly given the special characteristics of the school environment. This court has made clear that exposure to offensive ideas does not burden free exercise. And it has held that the government is not required to do its daily work in ways that make it easier for parents to raise their children in the faith. Given the diversity of religious beliefs in America, petitioners rule would require courts to adjudicate an infinite variety of curriculum challenges brought by parents with different religious beliefs. That is not hypothetical, as 40 years of litigation on these issues makes clear. The books at issue here, five among hundreds in the curriculum, are meant to foster mutual respect in a pluralistic school community. MCPS makes explicitly clear that students do not need to accept, agree with, or affirm anything they read or anything about their classmates' beliefs or lives. The lesson is that students should treat their peers with respect. I welcome the court's questions. Couldn't you solve those differences simply by restoring the opt-out? Your Honor, I think in this case the record makes clear that the school district did try to honor the opt-out, and at some point it became infeasible. Certainly there are circumstances where the right decision a school board might make in view of the particular needs of a community is to offer the opt-out. It's a different question from whether it's constitutionally required. How would you distinguish your case, this case, from Yoder? I think Yoder involved a religious obligation that adherents remove themselves physically from society. So what was at issue there was the conflict between the Yoders' sincerely held religious beliefs that they needed to remove their children from society in order to provide them with vocational training that the religion required, and that conflicted with Wisconsin's criminal compulsory education law. Yoder was a very clear application of Meyer and Pierce that simply went to the parents' right to determine where their children would be educated and not anything about what would go on in the schools. And Yoder, in fact, makes clear that it wasn't opining on the question of whether parents have any prerogative to dictate the discrete aspects of the curriculum, a clarification both Meyer and Pierce before Yoder themselves made. So Yoder is a complete withdrawal of students from school, and you say that's not as drastic as picking and choosing certain messages that the parents don't think their kids should hear? Precisely. And again, I think Yoder was a direct application of Meyer and Pierce. Meyer and Pierce said 50 years before that parents get to decide whether to enroll their children in public schools, and Yoder simply recognized the right of the old order Amish to withdraw their children from school at age 18. Meyer, Pierce, and Yoder are all very clear that they are not offering any opinion on what the rights of parents are once they enroll their children in public schools for precisely that reason. It becomes infinitely more complicated to honor parents' individual religious beliefs once they're in the public school environment. Why wouldn't a parent argue that the opt-out is a more specific version of Yoder because you're simply opting them out of specific programs as opposed to the entire school program? It may be for one parent that that is a more narrowly tailored approach, but the question presented here is whether it constitutes a burden to be exposed to this sort of instruction. And when parents have a right to invoke the Free Exercise Clause to shield their children from all manner of offensive curriculum, I think it becomes infinitely more complicated. Counselor, you said that nothing in the policy requires students to affirm what's being taught or what's being presented in the books. Is that a realistic concept when you're talking about a five-year-old? I mean, do you want to say you don't have to follow the teacher's instructions? You don't have to agree with the teacher? I mean, that may be a more dangerous message than some of the other things. Well, there are express directives in the support materials that Montgomery County provided along exactly those lines. But, Your Honor, I would point the court to Barnett, where the kids were young, they were eight and ten, and the court made a distinction between being required to pledge allegiance and affirm a belief in a graven image in that case, and merely being required to remain passive during the pledge ceremony and being instructed on what the pledge was, what the flag was, and what it meant. Well, that's a particular ceremony, which I think I would sort of put aside when we're talking about the basic instruction here. You know, read this, or this is what it shows on an issue that presents serious religious objections for the parent. So, I mean, I understand the idea when you're talking about a sophomore, junior, whatever in high school, you know, where the point is you want them to sort of push back on some of this, but I'm not sure that same qualifying factor applies when you're talking about five-year-olds. Well, so if that's relevant to the question, Your Honor, then I think that the line that we advocate between exposure and coercion is the relevant one, and there may be circumstances where given the age of the student, or given the particular presentation of information in the classroom, a plaintiff may be able to make out a case that their child is being coerced. But the court, I think, has to accept what Montgomery County sort of represents as the basis for the presentation of this curriculum, and what's in the record are directives to say, for example, I understand that is what you believe, but not everyone believes it. In any community, we'll always find people with beliefs different from our own, and that's okay. We can still show them respect. Counselor, on that score, the exposure versus coercion line that you've asked us to draw, how does that play out in the case of the Muhammad image for a Muslim student? I didn't see you answer that in your brief. So I think we do answer it in the brief, but to answer the question directly, assuming that the prohibition is on viewing a visual depiction of the Prophet Muhammad, in those circumstances, the school is coercing an individual to act contrary to a religious belief. Even though just being exposed to the image. The exposure there is coercion in your view. I think it's the difference between exposure to ideas and activity that coerces you to engage in conduct that is in violation of your beliefs. So the idea is the image of the Prophet. I think the image is the image. In other words, if there were a book. So it's an image that makes the difference rather than an idea. I think it's conduct that makes the difference. And I think this is an important distinction. So if there were a book that described someone drawing an image of the Prophet Muhammad, I don't think a parent would have the ability to object, even given the religious prohibition at issue, on simply being exposed to the idea that people might depict the image of the Prophet Muhammad. Being required to view the depiction of the Prophet Muhammad in contravention of religious objection is being required to engage in conduct. Well, the child is sitting passively and the teacher is just reading a storybook. I think if the storybook features the depiction of the Prophet Muhammad, that is a compulsion to engage in conduct that violates your religious beliefs. Now again, I think what's important here is that this goes simply to the question of whether the right is being burdened. No, I understand that.  But it's very... Counsel, I do understand that. I have a slightly different question. And you say this is only about exposure. But we also have in the record some guidance materials for teachers. And one of which is if a student says that a boy can't be a girl because he was born a boy, the teacher is to respond that comment is hurtful and we shouldn't use negative words to talk about people's identities. Is that exposure or is that something else for a three to five-year-old? So two points on that, Your Honor. The first is that the record is seriously underdeveloped on whether and how these support materials are used. These were recommended potential answers for questions that students might pose. There's nothing in the record about whether any teacher... Let's say a teacher does as instructed, though, and uses that. Is that exposure or is that coercion in your world? I think that as Your Honor has recited it, it is exposure to particular ideas and teaching students to be civil in the classroom. There are certainly circumstances where use of that script in a particular context could give rise to a claim of coercion. If, for example... And again, I think the distinction between exposure and coercion is one that's quite familiar to the court. The court undertook precisely that analysis in Kennedy and in Town of Greece versus... I'd like to talk about Kennedy and maybe Masterpiece a little bit, too, where... Forget about Yoder and substantial burden. The court focused on, particularly in Masterpiece, the statements of those involved in the policy. And here we have some statements from board members suggesting that students were parenting their parents' dogma, suggesting that some parents might be promoting hate, and suggesting it was unfortunate that they were taking a view endorsed by white supremacists and xenophobes. I didn't see you directly address those comments in your brief, and I just want to give you an opportunity to do so here and ask you, does that suggest a hostility toward religion akin to what we found in Masterpiece, and why wouldn't that be enough to trigger strict scrutiny on its own? In the first place, the question of whether there's a burden, I think, is a relevant starting point, and so I don't think we get to... Well, we found in Smith, and in Smith, if you're not neutral, if you're expressing discrimination towards religion in Masterpiece, if you're expressing this kind of hostility toward religion, you go to strict scrutiny, and we don't need to get into all the rest of these coercion versus exposure and doctrine about what constitutes a substantial burden. Respectfully, I think those cases, there was a clear burden in each of those cases. So as the question comes before the court in how you define the burden, I think that still needs to be answered before you get into any of the anterior parts. So you take the view that even if you have a non-neutral policy, and even if it was motivated by hostility toward religion, and even though the parents claim that burden, you still have to somehow meet an additional objective substantial burden test? Correct. I think that there's a prerequisite... Okay, I got your answer. I appreciate that. Do you want to comment about those remarks and what they represent? Certainly. I think the position of the board with respect to this policy is clear. The board adopted neutral policies where it allowed opt-outs for all reasons, including religious reasons, in a sincere effort to accommodate the viewpoints of all of the members of the community. It tried that. It failed. It was not able to accommodate the number of opt-outs at issue. It then adopted an entirely neutral policy where no opt-outs were permitted. I think some of those comments have been taken out of context. I think many of them postdate the actual withdrawal of the opt-out right by the school board. So I understand that some of them were in response to a parent's meeting after the withdrawal. So do you want to defend them at all or have any explanation for them that it isn't based on hostility toward sincerely held religious beliefs? Your Honor, my answer is that I think the statements speak for themselves. They are taken largely out of context, I think, in Petitioner's brief. Do you have context you wish to give them? They are intemperate statements. I don't deny that. I think the question of whether they motivated the school board to adopt a policy that discriminates against people on the basis of religion is not borne out by the record. And finally, I'd just point out that in – I apologize. Oh, no, no. No, please go ahead. Okay. I just wanted to ask if there's been some question about the record and whether these were just books on the shelf or whether they were actually used in the classroom. How could it be that the opt-out policy became unmanageable if they weren't part of the instruction? Because if they were just on the shelf and the parents sought an injunction saying we don't want to be taught, then presumably that's no big deal. You'd say, okay, fine. You're not going to be taught. There's nothing to opt out of because they're just on the shelf. Certainly. There were certainly classrooms where the books were read out loud or they were pulled off the shelf by a student and the student read it with a peer or many peers. They were used in the classroom the way that any book is read in the third or second grade. And so that is in the record, that they were used in the classroom and it is in the record that the teachers had this discussion material. And in the Intersection Allies, the discussion guide is actually part of the book. The explanations about gender and all of that sort of thing are not even part of the separate instructional materials but part of the book itself. All of that is in the record, right? Absolutely. So with respect to how the supporting materials, even the ones that are an adjunct to the book like Intersection Allies, absolutely in the record. What's also in the record in the Hazel Declaration is that some use of the books was required. Do I know how it was actually used in all of the classrooms in 130 elementary schools? No. But the expectation is that they're going to be used just as any other curriculum material is used. So it seems to me then that really the lack of a record matters most if compulsion is the standard, right? Absolutely. Because if compulsion is the standard, then I can see why we would need more in the record about, you know, if it really is required that the teacher would have to ask a student to renounce beliefs or to abandon beliefs in some way, then we would want to see record evidence. But if it's not compulsion, if it's interference in the way that your friend on the other side has articulated it, then it seems to me we have that in the record because we have the books being read in the classroom. It's not mere exposure. So I think exposure to ideas in the classroom, whether they come in the form of a teacher reading a book to a student or a student reading a book to a fellow student, that is certainly on our side of the line between exposure and coercion. There's a set of facts where the presentation of the material in the classroom might give rise to coercion. Well, it's not just exposure to the idea, right? If it's exposure, if it's presentation of the idea as fact. That's different, right? I don't... It's not just some people think. That's exposure. Some people think X. Some people think Y. It's saying this is the right view of the world. This is how we think about things. This is how you should think about things. This is like two plus two is four. I disagree with that characterization of the record. So I think that it needs... Let's say that is in the record, okay? Let's say it's not just some people think X, other people think Y. We live in a pluralistic society, period. Let's say it is some people think X and X is wrong and hurtful and negative. Is that... I mean, that's more than exposure, I think, on your theory. That is more than exposure and those facts may well be relevant to a coercion claim. I don't think that is what the record says. But if it's not coercion, you know, let's say that I think it's something less than coercion. You concede that that would show, you know, interference with hindering of a parent's right to... I don't because I think the parent's right to shield their children from offensive curricular materials is no greater than the child's right to be free from offensive curricular materials. And if on our theory of the case, children have no right to be shielded from offensive curricular materials that share a view that conflicts with their religious belief, parents don't have a greater right than to shield their children from... Counsel, can I ask you... Can I ask you a question? Justice Lujan? I just have... I'm sorry. Go ahead. I just have one question to follow up. I just want to ask you quickly about this idea of whether this is a public benefit or compulsion given the compulsory attendance law. Is it kind of your position that because parents have the right to send their children to private school or to homeschool that that in and of itself is the opt-out? No, that's not a position we've taken here. The compulsory education analysis has always been part of this court's coercion inquiries. So in Lee v. Weissman and Santa Fe, the fact that the children who were enrolled in this public school were required to be there for the graduation ceremony and there's a lot of discussion about whether it is or is not. I think the compulsory nature of public education, where a student is enrolled in public school, is relevant to whether there is coercion. It is one factor among others. The fact that a student who is enrolled in a public school and needs to be there is exposed to offensive ideas simply goes to the question of whether we are right that exposure to ideas, regardless of whether they conflict with religious belief, constitutes a burden on free access. So it doesn't matter to you that you could go to religious school or private school or homeschool for purposes of the analysis, the legal analysis? For purposes of the analysis, correct. Mr. Schoenfeld, could I make sure I understand what you mean by coercion? You say in your brief that there are three things that cannot be done. The state cannot say you can't go to a private school or a religious school. The state cannot say you must affirm certain beliefs. And the state cannot say that you're going to be disqualified from benefits because of your religious beliefs. Is that the universe? Those are the three situations in which there's coercion. No, Your Honor. I think what the court said in Ling is that coercion is found when there's a tendency to coerce individuals into acting contrary to their religious beliefs. So, for example, in the... It goes further. It goes further than that. So suppose a school says, we're going to talk about same-sex marriage. And same-sex marriage is legal in Maryland. And it's a good thing. It's moral. It makes people happy. Same-sex couples form good families. They raise children. Now, there are those who disagree with that. Catholics, for example, they disagree with that. They think that it's not moral. But they're wrong. And they're bad. And anybody who doesn't accept that same-sex marriage is normal and just as good as opposite sex marriage is not a good person. Now, what if that is what the school teaches students? I think that's absolutely coercion. I think where I found the line between exposure and coercion in your presentation, Justice Alito, was this is the state of the law in Maryland and elsewhere in the United States. People can fall in love, get married, even same-sex couples. Some people believe in it. Catholics don't believe in it. And then it stopped. And then it was directly derogatory of a particular set of religious beliefs. It was avowedly so. And that, I think, under any fair reading, would give rise to a coercion or a discrimination. So the school can teach students certain moral principles that are highly objectionable to parents. And that's OK. Yeah. They can't opt out. That does not burden their free exercise. There's no constitutional requirement of completeness in these contexts. The school could easily teach that evolution is one theory, and it is the correct theory. And I don't think there's any constitutional problem with that. Certainly, if a student taking a test said, you've taught me about evolution. Here are the principles of evolution. I'm reciting them to you. But I don't agree with that. And my faith teaches me differently. No teacher would penalize the student for saying that. And if the teacher did, that would certainly give rise to coercion. The opposite end of your spectrum of possibilities is exposure, which you talked about over and over. What does that mean? I would think that exposure, and we can take the example of same-sex marriage. Again, exposure is telling the students that there are a lot of people who marry a person of the opposite sex. There are also people who marry a person of the same sex, period. Leave it at that. That's exposure. If you go beyond that, is it still exposure? It depends on the context. I mean, I think Uncle Bobby's wedding is teaching third-graders or second-graders precisely that. It's telling it through a story. And the fact that in that case, it's Uncle Bobby and Jamie, rather than in Uncle Peter's Chinese-American wedding, it's Uncle Peter and his wife. Well, don't you think, I mean, just as Sotomayor and I were discussing this before, and we could have a book club and have a debate about how Uncle Bobby's marriage should be understood, but I think it clearly goes beyond that. It doesn't just say, look, Uncle Bobby and Jamie are getting married. It expresses the idea subtly, but it expresses the idea, this is a good thing. Mommy said, Chloe, I don't understand. Why is Uncle Bobby getting married? Bobby and Jamie love each other, said Mommy. When grown-up people love each other that much, sometimes they get married. I mean, that's not sending, subtly sending a message, this is a good thing. I think that's a way of a mother consoling her daughter who's annoyed that her favorite uncle is distracted and doesn't have time for her. But even if the message were, some people are gay, some people get married, I don't think there's anything impermissibly normative about that. It is a story that is being used to teach students that, just as in the 99 of the 100 books that we read about couples, it's a man and a woman, there also may be a man and a man. I mean, why is the Montgomery County Board of Education, in this argument, running away from what they clearly want to say? They have a view that they want to express on these subjects, and maybe it's a very good view, but they have a definite view, and that's the whole point of this curriculum, is it not? I'm not running away from anything the board has used to defend this. I think what's in the record is that the board wants to keep stability and respect for difference in the classroom. There is obviously an incidental message in some of these books that these life choices and these lifestyles are worthy of respect. I don't know how you can teach students to respect each other without teaching that. If the book were about, you know, Uncle Bobby's wedding, they get married, and the rest of it is, that was awful, then there would be a serious equal protection violation in the presentation of that curriculum. So, the incidental message that these things ought to be normalized and treated with respect, I think, is simply part of the work that the school is doing in cultivating respect in a pluralistic school. Well, the plaintiffs here are not asking the school to change its curriculum. They're just saying, look, we want out. Why isn't that feasible? What is the big deal about allowing them to opt out of this? So, a couple of answers. I think on the facts of this case, we have the natural experiment of the schools permitting these opt-outs and then finding that it was not administrable. It wasn't true in every school. Well, why is it not administrable? You have, they're able to opt out of the health class, right? The health class is taught discreetly. There's a meeting, mandatory meeting for all parents where they are told exactly what's going to be taught in it, and they're given the option of opting out of the unit of instruction, not the particular... Well, that's how you define the unit of instruction. You could define the unit of instruction to include the reading of these storybooks. And that's not compelled as a matter of Maryland state law. It's not compelled as a matter of state law, but why should it not be compelled as a matter of the free exercise clause of the First Amendment? What is infeasible about doing that? So, again, I think the experience of the schools with respect to these five books showed that it was infeasible. And let me give you an example. Let's say this school, an exquisitely competent and well-resourced school, is able to say, on Tuesday at 9 o'clock, we're going to read Uncle Bobby's Wedding. We're going to make arrangements for alternative space. We're going to give suitable supervision for our six-year-olds, and we're going to give them an alternative assignment that accomplishes the same ELA goals. Let's say that happens, right? That, they were able to pull off. The next week, someone says, that was my favorite book ever. I'm going to pull it off the shelf, and I'm going to ask Alan to sit down and read it with me. What happens then? The teacher can't simply summon a librarian to come to the school, say, those were the books you opted out of that lesson. Well, I don't think you're really answering my question. Why can't this all be put? We're going to read Uncle Bobby's Wedding and these other books, but we're going to read it during a period of time that includes the health class, and children are already able to opt out of that. So they can opt out of reading these books. I think there's no constitutional obligation to treat these books that introduce people to LGBT characters in a curriculum that is meant to teach about different matters. I'm not understanding why it's not feasible. The county had an opt-out. You said every other school board in the country has opt-outs for all sorts of things. The county has opt-outs for all sorts of things. The other Maryland counties have opt-outs for all sorts of things, and yet for this one thing, they changed in mid-year and say no more opt-outs. I'm just not understanding feasibility. So again, I think what's in the record is that with respect to these books as they were deployed in the classroom, there was high absenteeism in some schools. For example, dozens of students being opted out in, I think Mr. Baxter said the average size of an elementary school in Montgomery County is 700 students, so each grade is 125. If you have dozens of students walking out, making arrangements for those students to have adequate space and supervision and alternative instruction I think is infeasible. But they do it for all sorts of other opt-outs. They don't do it for all sorts of other opt-outs. There's a limited universe of things that students can opt-out from. The Family Life and Healthy Sexuality curriculum stands alone. It is mandated by the state. It is something where you are able to predict precisely when the curriculum is going to be deployed. There's a four... It's the most similar substantively to what we have here, and there's an opt-out allowed there. I guess I'm not understanding why Montgomery County School Board stands alone. I think in the country, you can tell me if there's another school board that's done something like this. I don't. I apologize. The kind of books that are being used and prohibiting opt-outs, and I guess I'm just not understanding. The whole goal, I think, of some of our religion precedents is to look for the win-win, to look for the situation where you can respect the religious beliefs and accommodate the religious beliefs while the state or city or whatever it may be can pursue its goals. Here, they're not asking you to change what's taught in the classroom. They're not asking you to change that at all. A lot of the rhetoric suggests that they were trying to do that, but that's not what they're trying to do. They're only seeking to be able to walk out so that the parents don't have their children exposed to these things that are contrary to their own beliefs. I understand, Your Honor, and there may well be circumstances where a school district can engineer the win-win. Montgomery County Schools tried to accomplish an educational goal of introducing these books for a particular purpose. They then attempted to accommodate religious opt-outs in the school, and they weren't able. Mr. Schoenfeld, what is that purpose? I thought the answer to Justice Kavanaugh's question was that the school board was explicit that the books were to be used only to supplement the English language arts curriculum as reading instruction and not to teach about gender or sexuality. So it wasn't as though the books were being introduced for the purpose of enhancing the gender and sexuality component, and therefore people can opt out of that whole thing. It was that we're talking about English here, and in addition to the other kinds of picture we have on the shelf and we talk about in class, we're going to introduce these books as well. I think that seems pretty infeasible in English when you're talking about reading instruction, that every time this particular kind of book comes out, we have to start letting people leave the classroom. I agree with you, and I think it goes beyond the readings of the book because, as Justice Sotomayor quoted the language thought and the injunction, I do think that in the context of a classroom where one student is having a discussion with another, or a student comes in from the playground and asks the teacher to define a particular concept, or someone said my brother's transgender, what does that mean? I think those are all within the scope of the right that the petitioners are urging here and would require this sort of accommodation. I don't think they're talking about anything student on student, so I disagree with what you just said, that that's within the scope. I disagree with you. I understand why they might read it that way, but I think if you think about the way a third grade classroom operates, and you think about the fact that there are some students sitting in the corner and they say, this is a great book, I'm going to take it off the shelf, and three and then five and then nine students gather around to read it, and they say, teacher, I want you to come over and watch us doing that. All of those things I think fall within the definition of curriculum at that lower grade. It's mayhem, and the ability of teachers to manage the line between what is curriculum content coming directly from the teacher and coming indirectly from the sort of socialization in the classroom I think is very hard to draw. Thank you, counsel. Justice Thomas? You, in chatting with Justice Kavanaugh, you mentioned that the opt-out was unworkable because there were so many students who opted out. What do you mean by that? So the record is limited on this point, but the Hazel Declaration talks about the fact that principals reported to the school board that there was high absenteeism and gave the example of one school where dozens of students were opting out. It was that because they found the materials objectionable or for religious reasons or what? So there are two different paragraphs of her declaration that speak to this fact. In that paragraph, it doesn't specify. Elsewhere in the declaration, it makes clear that many of the opt-out requests were not religious in nature, and parents objected, for example, to the age appropriateness of materials have nothing to do with religious prohibitions. Justice Alito? Well, we've had a discussion of many different tests and precedents and hypotheticals, but let me just draw back to what's going on in this particular case and get your reaction to this. So you have a case where some of the plaintiffs are devout Muslims. They say, we have a solemn religious obligation to raise our children as Muslims, and that involves certain moral principles that we want to instill in our children, and the school is teaching our children moral principles that are in conflict with ours, and we pay taxes to support the public schools, but we don't have enough money to send our children to private schools, and one of us can't stay home and provide homeschooling. So we just want to be able to take our children out of the part of the instruction that we find objectionable, and what's your response to that? Your response to that is just, well, it's too bad, all right? This is the public school, and the public school can teach what the public school wants, and you don't like that? Well, you can send your children to private schools. There's no indifference to the religious beliefs of the petitioners in this case. The school did what it could to accommodate those views. There are simply circumstances in which what the petitioner or what any plaintiff recognizes that a burden on their religious belief is not a legally cognizable one, given legal and practical terms. Well, it's nice that you say that they respect the parents' religious beliefs, but basically your answer is, it's just too bad. You've got to send your children to school. You can't afford to send them to any place except the public school, unlike most of the lawyers who argue cases here. They can send their children to private schools. We may think that that's the way most of the world is, but it's not. It's just too bad. My answer is that public schools are democratically controlled for a reason. The school board here is democratically elected. The entire process of adopting this curriculum is open and transparent. These books are on review for 30 days before they're even made part of the curriculum. There's been a multi-level appeal process. There's plenty of opportunity for parental insight. And just to draw an analogy to another case from this court, in Bowen v. Roy, there was no dispute that the assignment of a social security number would rob Little Bird of the Snow of her spirit. And this court made the judgment in that case that fully crediting the sincerity of that belief and fully crediting what the parents described as the imposition on their daughter, there was still some breathing room that the government needed to be given to operate in that case. And you think that providing an opt-out under these circumstances where you already allow opt-outs from the health class and opt-outs for other things is comparable to what the plaintiffs were asking for in that case? I don't think it's comparable in terms of what the plaintiffs were asking for in that case. I do think that under a doctrine where you can't question the sincerity of the beliefs, and so in that case, there was the most dire consequence for Little Bird of the Snow. There is simply no way for the government feasibly to honor the consequences of treating each person's individual religious belief, no matter how sincere, no matter how serious, as a burden that triggers the entire scrutiny apparatus that comes after it. So your answer to the parents that I talked about, which are real parents here, is just, well, if you don't like this, you got to get involved in politics and run for the school board and change it through politics. Basically, the public schools can do pretty much whatever they think is correct, as far as the curriculum is concerned. I don't agree with the second part of your answer. I don't think it's true that the public schools can do whatever they want. There are clear lines to be drawn. This court has drawn them in cases like Kennedy and Barnett and Town of Greece in a different context. But I certainly don't think it's true that public schools can do that. One last question. You say that history is on your side. History and tradition include not only the – it stretches back to the dawn of American public education that parents can't get opt-outs, right? That's what history shows us. Correct. And one of the cases you cite to support that is a decision by the main Supreme Court, Donahoe v. Richards, decided in 1854. Correct. And what was involved in that case? That case involved a Catholic student who did not want to be required to read the King James Bible. I fully credit – She was expelled. And she was expelled. And I fully credit that that reeks of anti-Catholic bias, as this court has recognized in other contexts. The point in that case – I understand, but why did you cite that as support for the history that you think supports you? Because – The history is that public schools did all sorts of things that might violate the Constitution today. The point was in response to Petitioner's invocation of a much more recent history about opt-outs from sex education. All right. Thank you. Mr. Sotomayor? Joan and Phil, you talked about the review process for parents. They don't have to run for the school board. It's a fairly complicated four levels of review if a parent objects, correct? Correct. There's a process for adopting curriculum as part of the school materials, as instructional materials at the beginning. And then if parents don't like it, either at that point in time or at some later point in time, given how it's being used, they can appeal it to the deputy superintendent for instruction, the superintendent, the school board, the Maryland State School Board. And in fact, we cite a case in our papers where the parents objected to the classification of these materials outside of the Family Life and Human Sexuality Unit. And that case went through the state school board and is now working its way through the Maryland State Courts. Now, at least two of the books that was represented were removed from the curricula as a result of this appeal process? I don't know where they were in the appeal process, but they were removed from the curriculum as part of the ordinary review process. Now, Justice Alito, I'd like you to address Justice Gorsuch's point. Justice Barrett questioned whether this is really a public benefit because attendance is coerced. So if it's not a public benefit, that leaves us in part with discrimination. And I think you said to Justice Gorsuch that you still need a burden, even if you treat people differently because of their religion?  There is a line or circuit split. There was recently on that very issue whether a de minimis burden qualifies or doesn't. And we said no, a de minimis burden doesn't qualify, doesn't eliminate the discrimination. But there has to be a difference of some meaning. Is it your point that this is not being treated differently? So I don't think that there's any facial or non-facial discrimination here. The opt-out applied to all aspects of the curriculum previously, and then there are no opt-out rights for any aspect of the curriculum. The things that people are able to opt out of are non-curricular, like Valentine's Day or Halloween parties, or they fall within the family life and human sexuality. Is that distinction alone? There are some who would argue that that distinction alone is not neutrally applicable. I think under Tandon, it is neutral and generally applicable. The question in Tandon is whether any secular activity is being treated better than any comparable religious activity. And there's nothing like that here. There's no distinction being made in either version of the policy between secular and  There's nothing intrinsically religious about these opt-outs. Many of them were taken for non-religious reasons. So under any of the court's tests, including Masterpiece Cakeshop, I don't think there's anything that gives rise to even an inference of discrimination that would trigger some distinct analysis that might not require a burden. Why is this different than Masterpiece? In Masterpiece, it was a board member. Well, in Masterpiece Cakeshop, it was an adjudicative context. And the court made very clear in that context that it was addressing the question of whether a party whose case is being decided by the adjudicative body had been discriminated against and therefore had been pressured or coerced into adopting a religious belief. The court is explicitly clear in Masterpiece that it was not opining on whether that analysis is appropriate in the legislative or executive. If we reply on the statements of isolated board members, we're in a real pickle, aren't we? Yeah. And I think that that's what Justice Scalia pointed out in Lukumi and other cases where he said it's folly to try to identify individual statements made in the democratic process and rely on the individual statements of legislators. You've called the statements by that one board member that Justice Gorsuch read as intemperate. There were some, but the examples that were provided about xenophobes or white racists were in the concept of the extent of public disruption that would occur if an exemption was given to everyone for any reason. Certainly, the prompt for it was not anything about a particular religious person or a particular set of religious beliefs. It was in the context of a discussion about whether opt-outs should be allowed at all for any reason. And it was disruption that that board member was concentrating.  Thank you. Justice Kagan? Mr. Schoenfeld, I think it would be fair to say that Mr. Baxter and Ms. Harris did not want to draw lines, that if there was material and it was being used in instruction in whatever way it was being used to whatever age kids with respect to whatever subject matter, if there was a parent who had some sincere religious objection to that, that that parent would be allowed to opt out. And when I pushed Mr. Baxter a little bit on that as to the consequences of it, he said, you know, like, I don't want to draw lines for you, but really the problems, the problems here, the places we see objections are in a much more limited set of cases. We don't see a lot of objections in high schools. We don't see a lot of objections about evolution classes. You know, is that true? And should we count on it being true? And how can we tell if it's true? So two answers, Justice Kagan. The first is, I don't think you can count on it being true for exactly the reason Your Honor gave, which is once this court constitutionalizes that prerogative, you're in a completely different world in terms of parents' willingness or ability to invoke it. And with respect to the question of whether it is empirically true, the best data point is the last 40 years of litigation on this topic. And I think the superintendent's brief in support of neither party, Professor Lupu's brief, and also the NEA brief just recount for you the dozens of cases to all aspects of the curriculum that have been brought over the last 40 years. And the way that courts have controlled for the volume of those cases is to stop the inquiry at the burden stage and hold consistently in those cases while fully acknowledging that there may be circumstances that give rise to a coercion, fully recognizing that exposure to ideas, even if they offend religious beliefs, do not qualify as a burden for free exercise purposes. Thank you. Justice Gorsuch. I just want to make sure I understand a few fact things and then a law question. What age do you in Montgomery County teach students normally about human sexuality? I think that it begins in either fourth or fifth grade. A human sexuality class? Family life and human sexuality curriculum. I'm not entirely sure. Starts in fourth or fifth grade, you think? Is there anything you can point us to in the record on that? I don't think so. Okay. And second, these books are being used in English class. The division between English class and other things in a second grade classroom doesn't really exist. You're sort of in a room with a teacher and somebody's learning. I appreciate that. I went to second grade too. But it's part of the English curriculum that these books are being used in. That's, I thought that was. Yeah, I'm not fighting the premise. I'm just saying. It's not the math class. It is not. It's not the human sexuality class. It's the English class. It is certainly not the human sexuality class. I'm just sort of fighting the premise that there's a neat distinction. Okay. And they're being used in English language instruction at age three. Some of them. So, Pride Puppy was the book that was used for the pre-kindergarten curriculum. That's no longer in the curriculum. That's the one where they are supposed to look for the leather and things and bondage, things like that. It's not bondage. It's a woman in a leather. Sex worker, right? No. No? That's not correct. No. Gosh, I read it. It's drag queen and drag queen. The leather that they're pointing to is a woman in a leather jacket. And one of the words is drag queen. And they're supposed to look for those. It is an option at the end of the book. Yeah. Okay. And you've included these in the English language curriculum rather than the human sexuality curriculum to influence students. Is that fair? That's what the district court found. I think to the extent the district court found that it was to influence, it was to influence them towards civility. The natural consequence of being exposed. Whatever. But to influence them. In the manner that I just mentioned, yes. And responding to parents who are concerned, do you agree that there was some intemperate language used? I don't know that those were responding to parents who were concerned. This was after the fact for most of these comments. And this was in a very public setting, which obviously got heated. And some intemperate comments were used, certainly. And I want to understand your context that you were giving about the statement that some Muslim families, it's unfortunate that this issue put some Muslim families on the same side of an issue as white supremacists and outright bigots. I think in response to Justice Sotomayor, you're trying to give some context to that. I don't think I was speaking directly about that comment. I think that comment was given or was made in June, which was several months after the decision to withdraw the opt-outs was made. I don't have context for that statement there. Okay. And then the legal question. Why isn't discrimination against religion a burden on religion? If a state, now this is hypothetical, not moving away from there, if state actors intentionally discriminate against religion, what secular purpose, valid secular purpose could that serve? And how wouldn't that be a burden? So I don't know. I mean, it depends on the hypothetical, what the state is doing and whether there's a secular purpose. That's hard to imagine one. But if this state is discriminating against Muslims or Catholics or Protestants or whatever, I think this court has recognized that when an enactment that discriminates on its face or has recognized with respect to an enactment that discriminates on its face, it is intrinsically coercive. That's how the court has performed the burden inquiry. If you are privileging one religion over another, you are coercing people to subscribe to that particular set of beliefs in order. That's a burden. Yeah, absolutely. Thank you. Mr. Cabot? A few things on exposure. You use that term, I believe, to include not just exposure in the sense of the book on the shelf, but also the communication of those ideas by the teacher in the classroom. Correct. And that's not usually, I think, what we think of as exposure as opposed to instruction. But well, the question presented is about participation and instruction, which was precisely one of the things that the Barnetts objected to in being present for the flag ceremony. But I think it's analogous to Kennedy, right? The question there was whether people were merely exposed to Coach Kennedy's prayer, even though the court acknowledged that people might see it, people might hear it, and people might be offended by the content of it. Okay. And on Justice Kagan's question about the no lines, I took that to be the position of petitioners in the United States with respect to burden, in the sense that you can claim a religious objection or burden to lots of different things, and people do, but that the line drawing occurs when you do the strict scrutiny analysis. Is that not your understanding? I don't know what you're asking, if that's my understanding of it, but let me try to answer it this way. Your understanding of their position. In other words, that they do draw lines, but it's at the strict scrutiny stage. Well, the question presented to the court is obviously limited to burden. And what I understood Justice Kagan's exchange with petitioners counsel to reflect is that there is no way to draw a line once you are relying on the petitioners. As to substantial burden, but once you get to strict scrutiny, as some of our cases reveal, social security numbers, et cetera, there is line drawing once you do that. In other words, just because you have a religious objection to something doesn't mean you win. You agree with that, I think, in our case? Yeah, absolutely. Though in Bowen, the court stopped at the burden inquiry, at least with respect to the government's own use of the social security number. And you've mentioned a few times that the school board was democratically elected, democratically controlled, and being on the school board is a hard job. So, you know, we all respect that. But, you know, that can't be the end of it, right? Absolutely not. No. And liberty, we're here to protect the liberty in the Constitution from the democratic excess.  And so that was not my intention at all, was to respond to a specific question about what options parents have. And among them, I think, is resting control of the school board, implementing their preferred policies or participating, even in the curriculum selection process. And then I don't think he answered this, or maybe we got past it last time. Are you aware of any other county or city school board that has something similar to what's going on here? I'm not. But I think that the other side of the ledger is overstated because what is described in the amicus briefs about what other school boards in other states do is limited to what we traditionally consider health education. So I'm not certain that there's a large number of other states or county school boards that allow opt-outs from any curriculum for any reason. And then last point, just a comment, and you can respond to it as you want. But Maryland was founded on religious liberty and religious tolerance, a haven for Catholics escaping persecution in England going back to 1649. I'm sure you're aware of this history. And Montgomery County has been a beacon of that religious liberty for all these years with a strong Catholic population, a substantial Jewish population, lots of different Protestant. I mean, you drive down any Connecticut Avenue or George Avenue, you see religious building after religious building. And I guess I'm surprised given that this is the hill we're going to die on in terms of not respecting religious liberty given that history. And so when history comes up, I just want to give you a chance to respond to how you situate that in Maryland and Montgomery County's history. Every school board walks a tightrope, as this court has recognized and other courts have  It's a difficult job balancing the interests of a diverse community. Montgomery County Public Schools are the most religiously diverse in the country. There may be different ways to handle this under other circumstances. Montgomery County did its best under these circumstances given their curricular goals. That seems to me a fundamentally different question. And it's an important one, but it is a fundamentally different question about whether there's a constitutional right to opt your child out of curriculum that you deem religiously. Thank you. It's a tough case to argue. I appreciate it. Thank you. Justice Baird. I just want to ask you a couple of questions about the instructional materials. So part of the conversation today has been about exposure and whether this is about teaching civility. And so I just wanted to read you a couple of things from the instructional materials to get your reaction of how, if at all, this plays into the analysis. So I don't understand petitioners to be arguing that, you know, there was an objection to being taught respect and kindness to those who have different beliefs. I understood them to be more focused on things like, you know, this is an instruction to the teacher. If a student observes that a girl can only like boys because she's a girl, the board suggested that the teacher disrupt the student's either or thinking by saying something like actually people of any gender can like whoever they like. You know, or on the transgender issue, when we're born, people make a guess about our gender and label us boy or girl based on our body part. Sometimes they're right. Sometimes they're wrong. When someone's transgender, they guess wrong. When someone's cisgender, they guess right. So, you know, it's kind of along those things, which seem to be more about influence, right, and shaping of ideas and less about communicating respect because it's less about communicating respect for those, you know, who are transgender, who are gay, and more about how to think about sexuality. What is your take on that and how we think about this, whether this really is just about exposure and civility and learning to function in a multicultural and diverse society and how much of it is about influence or, as petitioners would say, indoctrination? Certainly. I think what you've quoted, Your Honor, are suggested responses or proposed responses for age-appropriate ways to respond to questions that may arise in response to these texts or otherwise. The same response about disrupting either or thinking is given when someone says, Dresses are for girls. Boys can't paint their nails. Those are boy toys. These are simply ways of contextualizing the information that's being learned and to give students the predicates for being able to respect each other. The school, the express directive from the school is you don't need to understand your  You don't need to agree with them. You don't need to affirm with them. But you do need to treat them with respect. When ensuring that that goal is met in the classroom has the incidental sort of implication of answering a direct question about what it means to be transgender, that's an option that's offered to a teacher. There are certainly under certain circumstances where use of these materials or different comments, if a teacher were to say something pejorative or negative or begin to treat students differently in terms of allocation of sort of resources in the classroom based on how they responded to that, that's a coercion claim. But simply explaining to students what fundamental concepts are so that they can treat each other with respect I think is no different than Well, but those things that I read were more than about respect. It was more about kind of what I was talking with you about before, like two plus two is four. Like this is how it is. You know, gender is not something that can be identified at birth, for example. So, I mean, I guess that that is one way of teaching respect because it's saying, you know, it's validating the other worldview here, the one that's different from petitioners by saying, no, no, no, this is right. This is how we should understand that. And so that is why you should respect and treat with kindness. Or one could say, I understand, and some of the instructional materials did frame it this way, the way I'm about to say, which is you might not agree or this might be different, but we have to respect and treat everyone with kindness. So I don't understand petitioners to be objecting to the latter kinds of statements. I understand them to be objecting to the this is the way it is kind of thing. I understand them to be objecting to all of it, including just using the books with none of those materials. The only I agree. So I'm just talking about the instruction. So I'm sorry. So I think you and I see it the same way. With respect to the instructional materials, though, if we are in a world where you and I are parsing, which of these materials are impermissible or give rise to a burden on the impermissible side of the line from the others, the record is woefully underdeveloped on that point. These books were in use for nine months before petitioners sued. There's not a single factual statement in any of these declarations or anything else that explains how these supporting materials were used. It may well be the case that no second grade teacher ever uttered the words that you just quoted. But I think what petitioners said and their argument is that we're at the preliminary injunction stage and the instructional materials were given to the teachers. And I think the instructional materials reflect what the board hoped to accomplish by introducing these books into the classroom. And so what they're saying is before, we don't want to wait for the teacher to say this to our child. Our whole point is we know that this is part of the board's curricular choice. We know that these are the instructional materials that are given to the teachers and we don't want our child to be exposed to that. And so, frankly, if they got the injunction they were asking for, you know, then it would never be uttered. Yeah, I don't dispute anything you're saying. I think the relevant inquiry takes account of that temporal dimension for something essentially a pre-enforcement challenge here. It would not have been difficult if this was being used rampantly and impermissibly in classrooms for them to find a declarant who didn't need to be a petitioner to say this is what's going on in this classroom. There are hundreds. But they didn't have to have that for PI. They have to show a reasonable likelihood of success on the merits. And it's not a reasonable likelihood of success or that this injury is imminent to say this is what teachers have been given as a suggested discussion guide? This was distributed to 130 teachers in August of 2022 for teachers who voluntarily attended one of these materials and was otherwise made generally available. It's not a script. You're not required to answer that particular question if it arises with that particular verbatim response. I don't know any second grade teacher who could. So I do think some more particularized showing is required for someone to prevail even if the preliminary injunction is taken. So last question, do you agree that it was the purpose of the board to try to disrupt students' thinking and make them see, to disrupt their thinking and have them not see gender as binary and to accept, you know, basically accept LGBTQ relationships and ideas in this way, kind of the ways that I just read? I think the goal, I want to answer your question directly. I think the goal was to teach mutual respect. I think to the extent that students were unable to display mutual respect for their peers without having some further understanding that boys can play with girls' toys, for example, then that was absolutely part of the curriculum. So it was part of the curriculum to teach them that boys can be girls or boys can, or that your pronouns can change depending on how you feel one day to the next. That was part of the goal. So I think you're quoting from a book that was not part of the curriculum, but let me just set that aside. I thought that was in, they might be blending together in my mind. I thought that was from, I thought that was from the Allies book, Intersection Allies. I don't think so. I think there may be a quotation from the teacher's user guide at the end. Oh, at the end of Intersection Allies? Yeah, it may be though. I recall it being a quote from someone else. It doesn't matter. So I think the way that these support materials are framed are to help a teacher answer a student's question when he says, in this book, there's a boy who says that he's a  How can you be a girl when you were born a boy? And it's one resource to provide teachers with an answer to that question. The alternative was to provide nothing to the teachers, which I think would abdicate the school board's responsibility to ensure that their teachers are equipped to do their job. Thank you. Justice Jackson. So two quick final points for those of us who are trying to get a handle on the potential administrative challenges of notice and opt-out rights. Would you be recommending that we look at the school superintendent's association amicus brief? Because I thought that's what they were focusing on, that here are actual potential administrative challenges. Is that one of the resources? Yeah, I think that resource is well worthwhile, I think, for two reasons. The first is it goes through 40 years of litigation on this, going back to Mozart. And it has, I think, a bulleted list of all of the things that parents have raised, even under this sort of ancien regime, where these were not treated as burdens. And second, I think it makes a persuasive case about the administrability of the isolated family life and health education office. All right. And finally, as I understand your response to Justice Alito's question about what religious parents are supposed to do, I understood you to say that parents with religious objections can vote for members of the school board. They can go to school board meetings. They can object to the curriculum. Maybe the school board will agree with them, at which point we don't have a problem. Or maybe they won't. And if they don't agree, those parents in Montgomery County, at least, can pull their students out of school and homeschool them or send them somewhere else. But under petitioner's rule, as I understand it, parents who lose through the democratic process, who are not able to get the curriculum tailored in their local school boards the way that they would like, would have another option. And that option would be to go to federal court. And so instead of having democratically elected representatives and experts in the field making the decision about which books should be taught to kids in the classroom, you have federal judges flipping through the picture books and deciding whether these are appropriate for five-year-olds. I mean, I don't know how we would even go about that. It seems pretty troubling because ordinarily public education has been the subject of local control. We typically lack this specialized knowledge and experience to know what, you know, should be taught to kids and how and to look at the instruction manual and say, is this a proper response? So that's kind of a concern, I think. And I also think it's a concern that these questions don't always have one answer. Maybe, maybe in one community, one set of values, these books are fine. But in another community with a different set of values, they're not. And it's sort of the local process that allows that to cash out where people live, that allow their values to get expressed in the context of schools. And if we constitutionalize that, I wonder if we're going to have a real problem in terms of people with different values not being able to have a say in their local community as to what their kids learn. MR. BARTLETT I agree with all of that. And I think it goes back to Justice Kagan's point earlier where I think you described it as a sort of hydraulic pressure, which is once you constitutionalize it, I think you'll see an entirely different generation of challenges to school curriculum. So the last 40 years are the natural experiment where courts used burden as a meaningful filtering system for mere exposure to offensive ideas in the classroom versus where the presentation of the curriculum was becoming impermissibly coercive. I grant that there are limits on what schools can do with their time when students are in the classroom. But exposing them to different ideas, even ideas that offend their family's religious beliefs or make it more difficult for their families to raise them in the faith, simply doesn't qualify as a burden for the purposes in front of us. And I think that that burden analysis always has to be carried out in light of the special characteristics of the school environment, which I think, Justice Jackson, is precisely what you're getting at. A very important part of the special characteristics of the school environment are the fact that federal courts are not meant to sit as school boards in deciding these curriculum disputes. And I think my colloquy with Justice Alito illustrates that. If the question really turns on whether one reads Uncle Bobby's Wedding one way versus the other way, courts are going to be enmeshed in the most fine-grained disputes about how to treat curricular material. Thank you. Thank you, counsel. Rebuttal, Mr. Baxter? I'd like to start with four corrections to the record. First, the book What Are Your Words is the book where the children are told that their pronouns can change day to day. At 80, and this is in the district court's opinion, at 80A in the cert appendix note one, the district court found that this book and others were recommended. There are certain books that were part of this curriculum, but there are potentially hundreds of others that the board says you can use as part of this. There was a question about why isn't there more evidence from early on? Because there were opt-outs, and the board insisted over and over that there were opt-outs. We also know that the principal's letter didn't come in until November of 2022 saying that teachers were uncomfortable presenting this material. Was age inappropriate? They didn't want to be talking about romance between two kids on the playground regardless of their sexual orientation. On the question of use, I refer to 605 in the cert appendix where Hazel, the board's representative, said that they have to be used as part of instruction. 657, when they announced they were blocking the opt-outs, they said teachers must utilize with all students. These books are definitely being read by the teachers as part of the curriculum, and it's also at 63 of the district court transcript. And then also a question about when sex ed starts. The board's and the state's mandated regulation is in the record. It's at pages 62 through 83 of the joint appendix. There you start in pre-K with instruction that families can come in all different forms with all different kinds of parents, different kinds of gender identities and expressions. The same things that are being taught through these school books, you can opt-out when this comes up during health class, but not during story time, in which there's no instruction about how to use these books to develop characters, narrative arc, or anything else that you would expect in an English class. This is not a democratic process, withdrawing these overnight, comparing parents to xenophobes and white supremacists. This can't be part of the democratic process. The line drawing problem is on the board's side. I'm confused now about what exposure is. If you are being exposed to the Prophet Muhammad, that's not okay, but if you're being instructed something derogatory about him, that is. You can't get an opt-out. What does it mean to be derogatory to someone who is in the third grade? And the 40-year issue of litigation, I think, proves the exact opposite point. If you look at those cases in, for example, the NEA brief, those are Establishment Clause cases. They are curriculum challenges where we agree that the plaintiffs should lose. There are cases where people got relief and still sued, and a lot of them were resolved under strict scrutiny. Half the circuits have never even addressed this question. This is a question of First Depression in the Fourth Circuit, so there's no sense that these issues are going to create lots of kinds of problems. As far as feasibility, counsel made lots of arguments that are not in the record. This was their burden. The evidence was in their control. They could have put it into the record. It's not there. On a preliminary injunction, they should be held to their burden. We've been doing this for two years. Our clients are making great sacrifice to send their kids to private school, to home school. They've moved out of the county. They're not knowing what their kids are being taught. If the First Amendment means that you can be forced to pay, coerced to attend, indoctrinated, and then— Thank you, counsel. Thank you. The case is submitted.